## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Case No.** |
| **v.** | **Jury Trial Demanded** |
| **AARON CAIN MCKNIGHT; BPM GLOBAL INVESTMENTS, LLC; BPM ASSET MANAGEMENT, LLC; SHERRY REBEKKA SIMS; KENNETH MILLER; FROST and MILLER, LLP; AND HARMONY BROOKE MCKNIGHT,** | |
| **Defendants,** | |
| **-and-** | |
| **ACCELERATED VENTURE PARTNERS, LLC; and TIMOTHY NEHER,** | |
| **Relief Defendants.** | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC" or the "Commission"), files this Complaint against Defendants Aaron Cain McKnight ("McKnight"), BPM Global Investments, LLC ("BPM Global"), BPM Asset Management, LLC ("BPMAM"), Sherry Rebekka Sims ("Sims"), Kenneth Miller ("Miller"), Frost & Miller, LLP ("F&M"), and Harmony Brooke McKnight ("Harmony McKnight") (collectively, "Defendants"), and against

1

Accelerated Venture Partners, LLC ("AVP") and Timothy Neher ("Neher") (collectively "Relief Defendants"), and alleges as follows:

## SUMMARY

1.      From approximately March 2018 to September 2021, Aaron Cain McKnight repeatedly orchestrated fraudulent schemes through which he defrauded approximately 28 investors out of more than $8.4 million.  McKnight's schemes followed a similar pattern: McKnight portrayed himself as an experienced financial professional controlling financial services firms, which offered investment opportunities generating extraordinary returns.  He used these fabricated credentials to raise funds from investors for enticing, but non-existent, investment opportunities.  He then spent investors' money on himself, operating his outside business, sending money to friends and family, and making Ponzi-like payments to earlier investors.

2.      During this period, McKnight ran three schemes. The first scheme, which McKnight operated from March 2018 to at least April 2019, involved offering a high-yield investment "trading program" through his collection of entities known as the CGE Group (the "HYIP Scheme").  These investments promised exorbitant returns made possible through the pooling of investors' smaller deposits.  This pooling would purportedly enable investors to collectively take advantage of McKnight's and the CGE Group's experience and connections to access investment opportunities normally reserved for wealthier and more sophisticated investors.  McKnight would then theoretically use the pooled funds to make multimillion-dollar investments vaguely described as "trades" or "transactions," often through the European Central Bank.  In exchange for investing thousands of dollars each, investors were promised returns generally ranging from 40 percent to 100 percent per month for ten to twelve months.  In reality, the trading program did not exist.  McKnight spent the nearly $5.6 million in investor funds on

non-investment purposes, including the down payment on a home he later inhabited, funding a jazz club he partially owned, and making cash withdrawals.  None of the investors received any returns on their investment or their principal investment back, apart from a few Ponzi payments, and at least one investor lost their home.

3.      McKnight recruited Defendant Sims to help promote the HYIP Scheme.  Sims took actions which furthered the HYIP Scheme, including soliciting investors and repeating McKnight's investment pitch.  Defendants Miller and F&M aided and abetted McKnight in perpetrating the HYIP Scheme by knowingly or recklessly allowing McKnight to funnel more than $2 million of investors' funds through their law firm bank accounts despite numerous red flags.  Miller and F&M knew investors took comfort in the fact that the law firm was involved in the receipt of their investment funds.  Despite this knowledge, Miller and F&M took no steps to discern what function the investors expected F&M to serve or the purpose or propriety of the movement of investor funds.  In doing so, Miller and F&M knowingly imbued McKnight's scheme with an air of legitimacy and gave investors a false sense of security, thereby furthering McKnight's deception.

4.      From April to May 2019, McKnight solicited a $2.3 million investment from the client of an SEC-registered investment adviser ("RIA").  The investment would supposedly fund an insurance policy needed to close a $450 million note offering (the "RIA Scheme").  McKnight promised the investor would make a profit of $1 million in 60 days.  He also convinced the RIA and its client that he was collateralizing the investment with $2.3 million in gold.  But McKnight never used the investor's money to purchase an insurance policy for the note.  Instead, he sent only $900,000 to the insurance company and spent the rest of the money on non-insurance purposes, including repaying a pawn shop loan and making transfers to friends and family.  The

investor received no profits, was unable to collect against the purported gold collateral (which McKnight never had), and lost their entire $2.3 million investment.

5.    Finally, in September 2021, McKnight defrauded investors through a scheme in which he told investors through an intermediary that their investment would fund a "bond fee" required to complete a $300 million bond offering for a personal protective equipment company (the "PPE Scheme").  McKnight, through two entities he controlled, BPM Global and BPMAM (the "BPM Entities"), promised investors a 1,000 percent return on the investment in a maximum of 45 days.  McKnight raised $555,000 from investors for his PPE Scheme.  Defendant Harmony McKnight (Aaron Cain McKnight's sister) took actions which furthered the PPE Scheme, including signing investment agreements on behalf of the BPM Entities.  McKnight, Harmony McKnight, and the BPM Entities did not use the investor funds for any activities related to the bond, however.  Instead, they used the money on themselves including for restaurant charges, UBER charges, and Zelle transfers to friends and family.  McKnight never attempted to structure the bond offering.  The investors received no profits and never received their principal investment back.

6.    By engaging in this conduct, Defendant McKnight violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7.    By engaging in this conduct, Defendant BPM Global violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  McKnight and Harmony McKnight are liable under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for BPM Global's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

8.      By engaging in this conduct, Defendant BPMAM violated and, unless restrained and enjoined, will again violate Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.  McKnight and Harmony McKnight are liable under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for BPMAM's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

9.      In connection with the HYIP Scheme, by engaging in this conduct, Defendant Sims aided and abetted McKnight's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and, unless restrained and enjoined, will again aid and abet violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

10.      In connection with the HYIP Scheme, by engaging in this conduct, Defendants F&M and Miller aided and abetted McKnight's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and, unless restrained and enjoined, will again aid and abet violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

11.      In connection with the HYIP Scheme, Relief Defendants AVP and Neher received, directly or indirectly, funds or other property from McKnight, which are either the proceeds of, or are traceable to the proceeds of, unlawful activities alleged in this Complaint to which they have no legitimate claim.  It would be inequitable for the Relief Defendants to retain the proceeds from violations of the federal securities laws and such proceeds should be disgorged.

12.      In connection with the PPE Scheme, Defendant Harmony McKnight aided and abetted McKnight's, BPM Global's, and BPMAM's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and, unless restrained

and enjoined, will again aid and abet violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

13.     By this Complaint, the SEC seeks:

a.     permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, and civil penalties against McKnight, Harmony McKnight, Miller, F&M, and the BPM Entities, and an officer and director bar against McKnight, Harmony McKnight, and Miller;

b.     a conduct based injunction against McKnight prohibiting McKnight, directly or indirectly, including but not limited to, through any entity he owns, operates, manages or controls, from participating in the structuring, issuance, purchase, offer, or sale of any security or soliciting any person or entity to purchase or sell any security; provided however, that such injunction shall not prevent McKnight from purchasing or selling securities for his own personal account;

c.     permanent injunctive relief, a civil penalty, an officer and director bar, and a conduct based injunction against Sims prohibiting Sims from directly or indirectly, including, but not limited to, through any entity owned or controlled by Sims, (i) soliciting any person or entity to purchase or sell any security or (ii) offering, issuing, or writing surety bonds or other guarantees in connection with any purchase or sale of a security, provided, however, that such injunction shall not prevent Sims from purchasing or selling securities for her own personal account; and /

d.     disgorgement of ill-gotten gains against Relief Defendants AVP and Neher.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], because Defendants directly or indirectly, singly and in concert, made

use of the means or instrumentalities of interstate commerce or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue is proper in the Northern District of Texas pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices, and courses of business alleged in this Complaint, including but not limited to, the offers and sales of securities, occurred within this district.  Further, McKnight, Harmony McKnight, Sims, and many of the investor victims of the violations alleged reside in this district.

### DEFENDANTS

16.     **Aaron Cain McKnight** ("McKnight"), age 48, is a resident of Dallas, Texas, and principal control person of the BPM Entities and the CGE Group, described below.  McKnight is a convicted felon.  In 2000, McKnight was indicted for and ultimately pled guilty to charges of conspiracy to import and distribute the controlled substance MDMA ("ecstasy").  McKnight was sentenced to 110 months (*i.e.*, over nine years) incarceration.

17.     **Sherry Rebekka Sims** ("Sims"), age 55, is a resident of Waxahachie, Texas, a former friend of McKnight's, and control person of the SubGallagher Investment Trust ("SGIT").

18.     **Kenneth Miller** ("Miller"), age 72, is an attorney and principal of New York law firm Frost & Miller LLP.  He has been admitted to the New York bar for over 46 years.  Miller has represented public companies and their officers and directors in matters related to compliance with SEC regulatory requirements and in enforcement proceedings before securities regulators.

19.     **Frost & Miller, LLP** ("F&M") is a New York law firm consisting of two lawyers, Kenneth Miller and his partner, Greg Frost.

20.    **Harmony Brooke McKnight** ("Harmony McKnight"), age 40, is a Texas resident and sister of Aaron Cain McKnight.  She shared control of the BPM Entities and their bank accounts with McKnight.

21.    **BPM Global Investments LLC** ("BPM Global"), a Delaware company, purported to be a financial services firm under the control of Harmony Brooke McKnight and Aaron Cain McKnight.  It has never been registered with the Commission.

22.    **BPM Asset Management LLC** ("BPMAM"), a Texas company, purported to be a financial services firm under the control of Harmony Brooke McKnight and Aaron Cain McKnight.  It has never been registered with the Commission.

### RELIEF DEFENDANTS

23.    **Accelerated Venture Partners, LLC ("AVP")** is a Delaware corporation with offices in California.  AVP purports to be a private equity firm with $1.7 billion in assets under management.  AVP has never been registered with the Commission.

24.    **Timothy Neher,** age 57, is the founding partner of Accelerated Venture Partners, LLC.  Neher previously served as a director and CEO of public companies.  Approximately ten years ago, in connection with AVP, Neher registered a series of blank check companies with the Commission for potential SPAC transactions.

### RELATED ENTITIES AND INDIVIDUALS

25.    **The CGE Group ("CGE")** purported to be a multinational collection of financial services firms under the control of McKnight, with CGE being an acronym for Cain McKnight Group Enterprises.  It included entities called: (a) CGE Asset Management, LLC; (b) CGE Asset Management, Inc., (c) CGE Asset Management GmbH; (d) CGE Real Estate Holdings, LLC (Delaware); (e) CGE Real Estate Holdings, LLC (Texas); (f) the CGE Group LLC; (g) CGE, Inc.; (h) CGAM, Inc.; (i) CMcKnight Group Asset Management Inc.; (j) CMcKnight Group

Asset Management LLC; and (k) CMcKnight Group Enterprises LLC. None of these entities have ever been registered with the Commission. The entities comprising CGE appear to all now be defunct.

26.     **CGE Individual** was a Texas resident who served as president of CGE Real Estate Holdings, LLC. CGE Individual was involved in CGE's leveraging of investors' real property to invest in the HYIP Scheme.

27.     **Promoter A** was a North Carolina resident who solicited money from investors through an investment vehicle known as the Heaven's Way Investment Trust ("HWIT"). Promoter A caused the Heaven's Way Investment Trust to invest certain assets with CGE. Promoter A is now deceased.

28.     **Heaven's Way Investment Trust ("HWIT")** was a Georgia-based trust controlled by Promoter A that entered into at least four investment agreements with three clients. HWIT invested those clients' assets with McKnight and CGE. HWIT has never been registered with the Commission. HWIT is now defunct.

29.     **SubGallagher Investment Trust ("SGIT")** was a Wyoming trust controlled by Sims that purported to provide "financial guarantee instruments against it's [*sic*] own assets." Among other things, SGIT purported to offer "surety bonds" to uphold contractual obligations to investors made by HWIT and CGE. SGIT claimed to have more than $100 million in financial assets backing the surety bonds issued. SGIT has never been registered with the Commission. SGIT is now defunct.

30.     **RIA** is a North Carolina LLC headquartered in Matthews, N.C., and an SEC-registered investment adviser. RIA has no disciplinary history.

## FACTS

31.    Between 2018 and late 2021, McKnight defrauded investors out of more than $8.4 million through three separate schemes: (1) the HYIP Scheme; (2) the RIA Scheme; and (3) the PPE Scheme.[1]

## I.    THE HYIP SCHEME: INVESTORS DEFRAUDED OF NEARLY $5.6 MILLION

32.    In the HYIP Scheme, running from about March 2018 to April 2019, investors committed their principal investment for a number of months on the promise that they would be paid monthly returns ranging from 40 to 100 percent of their initial investment each month for ten to twelve months.  The first payment was to arrive within 30 days of their deposit.  For example, the first investor ("Investor A") invested $100,000, and was promised 12 payments of $100,000 for 12 consecutive months, beginning 30 days after she placed the investment.  These exorbitantly high returns would purportedly result from investments made in McKnight's nebulously described "trading program."

33.    McKnight attracted investors to this HYIP Scheme by posing as an investment professional running several investment entities collectively referred to as the CGE Group ("CGE").  He persuaded two individuals with no financial industry experience, Sims and another individual ("Promoter A"), to solicit investors.

34.    Sims and Promoter A repeated McKnight's investment pitch—*i.e.*, that investor deposits would be pooled to form larger investments than any of the individuals could make themselves.  They told investors that because of the increased size of these pooled investments, they would qualify for investment opportunities normally reserved for wealthier and more sophisticated investors, including investments with the European Central Bank.  Investors

---

[1] A chart summarizing the three fraudulent schemes is provided at the end of the Facts Section for ease of reference.

individually deposited amounts ranging from $25,000 to $1 million with McKnight's fictitious investment firm, CGE. In multiple instances investors were directed to make these deposits through attorneys they believed were acting as escrow agent. CGE was supposed to invest the funds in various "trades" and "transactions" generating "guaranteed" returns.

35.    The hallmark of a high-yield investment program ("HYIP") scheme is the promise of incredible returns at little or no risk to the investor, often with promised annual (or even monthly, weekly, or daily) returns of 30 or 40 percent, or more. HYIPs are unregistered investments typically run by unlicensed individuals (*i.e.*, people like McKnight who are not associated with a Commission registrant). HYIP schemes are often described in vague terms and may use the term "prime bank" or refer to well-known banks in their marketing materials or transaction documents. McKnight's HYIP Scheme exhibited all of these traits.

36.    McKnight propped up his own and CGE's false identities and reputation through a misleading CGE website that he created and/or controlled. He also used misleading promotional materials. These materials claimed, "CGE Group is a boutique asset manager providing investment management services across a variety of asset classes." They further claimed that CGE had broad expertise providing "strong and repeatable risk-adjusted returns over time" investing in "equities, fixed income, real estate, and commodities." Other materials McKnight created and/or controlled claimed CGE had billions in assets under management and an affiliation with the United Nations ("U.N."). McKnight used CGE letterhead indicating CGE had offices in seven cities across three continents. All of these representations were false and/or misleading. In reality, CGE was effectively a one-man operation (McKnight). It did not have offices in seven cities or on three continents, and labeling the few spaces and answering services McKnight used "offices" was misleading. Because CGE and McKnight misappropriated nearly all of the $5.6 million in investor funds they took in, CGE never truly had any assets under

management, never mind billions.  CGE never made any legitimate or profitable investments.  It also had no genuine association with the U.N.

37.     CGE promotional materials contained biographies of numerous people supposedly associated with the firm.  McKnight fabricated these individuals' credentials and, in many cases, their association with CGE.  For example, the biography of Umberto Speranza, Senior President and Managing Director of CGE Asset Management GmbH (not an individual actually affiliated with CGE and one of McKnight's aliases) claims Speranza is "a seasoned and distinguished finance professional with more than 20 years of experience in asset and wealth management mainly in Switzerland and Germany" who "serves as trusted special adviser to the Russian Government, and has been elected full member of the World Academy of Sciences for Complex Security / Moscow."  The biography of a CGE employee whose background was in mortgage analytics falsely claimed his former clients included: a former head of state of an emerging Asian nation, delegates to the United Nations, CEOs of major organizations across four continents, and Bollywood actors, actresses, producers, and directors.

38.     McKnight also fabricated his own credentials and omitted the serious criminal charges in his background in the CGE promotional materials.  The materials described McKnight as "a recognized and active investor, philanthropist, financier and venture capitalist who has extensive experience with emerging growth companies."  In these materials McKnight claimed to hold "official United Nations Credentials as the Chief Operations Officer of the United Nations NGO Global Millennium Development Foundation (GMDF)."  McKnight alleged that this affiliation provided connections to lucrative trading opportunities.  In reality, McKnight did not have any relevant financial industry experience.  He had no genuine affiliation with the U.N. He held no credentials with any entity associated with the U.N.

39.     McKnight used these false claims to persuade Sims and Promoter A, and at least one HYIP Scheme investor directly, that he had access to safe and profitable investment opportunities.  McKnight was ambiguous about how he intended to generate the promised returns.  He used generic terms like "trades," "investment programs," and "transactions" to describe the investments.  When pressed for specifics about the supposed investments, McKnight would shut down and refuse to provide details.

40.     McKnight's tactics worked and resulted in Sims and Promoter A recruiting 15 investors to collectively entrust $5.6 million in investments to CGE and McKnight.  McKnight and CGE, however, did not invest the funds in any sort of legitimate trading or investment program.  Rather, McKnight misappropriated it all.  He typically used these funds to pay personal expenses, make cash withdrawals, and fund outside businesses.  McKnight also used $480,000 of investor deposits to make payments promised to other investors—*i.e.* Ponzi payments.  These payments prolonged the scheme, helped convince Sims and Promoter A and investors that the trading programs were real, and induced existing investors to make additional investments.

41.     In some cases, to enhance the perceived safety and security of the investments, McKnight instructed investors to deposit their investment funds in an attorney escrow account.  He also paired the investments with surety bonds issued through an entity Sims controlled named the SubGallagher Investment Trust ("SGIT").  McKnight, however, had no genuine arrangement with any attorney to escrow the funds, and the surety bonds were worthless.

42.     McKnight took several steps to try to insulate himself from his fraudulent conduct in the HYIP Scheme.  First, McKnight typically inserted middle men between himself and investors, including Sims, Promoter A, and lawyers, as described below.  This tactic gave some investors the false impression that McKnight was not controlling their investments.  Second,

McKnight placed other peoples' names, some of which were aliases, instead of his own on the corporate documents for certain CGE entities. Doing so obfuscated the ownership and control of CGE. Third, McKnight created numerous entities with similar names (*e.g.*, CGE Asset Management, LLC, CGE Asset Management, Inc., and CGE Asset Management, GmbH). This approach created confusion and muddied the flow of money to McKnight's entities. Fourth, McKnight sometimes used aliases when communicating with investors by telephone and email. He also signed an alias's name to documents, including agreements with investors.

### A.    THE FIRST HYIP INVESTOR

43.    The HYIP Scheme began on or about March 2018, when McKnight personally solicited Investor A to invest in the HYIP Scheme. McKnight told Investor A he planned to pool her funds with those of other investors. McKnight explained that he would generate monthly 100% returns by trading medium-term-notes. He said he could buy these notes at a discount with the pooled funds and resell them for a large profit, which he called "seasoning" the note.

44.    As result of these discussions, Investor A entered into a Private Asset Management Agreement through her LLC with CMcKnight Group Asset Management, Inc. ("CGAM, Inc.") on March 23, 2018. The agreement gave CGAM, Inc. control of Investor A's investment of $100,000 for use in "transactions" and stated that the trading would be "authenticated" by the European Central Bank. The Agreement promised 100 percent monthly returns for 12 months, beginning 30 days after she placed the investment. The Agreement also stated that McKnight was President of CGAM, Inc. McKnight signed the agreement on behalf of CGAM, Inc. as its managing partner.

45.    Investor A wired her $100,000 investment to CMcKnight Group Enterprises, LLC (not CGAM, Inc.) through her LLC on March 29, 2018. Before receiving Investor A's wire, the relevant CMcKnight Group Enterprises, LLC's bank account had a negative balance. That same

day and the next, McKnight transferred out almost all of Investor A's $100,000 funds for non-investment purposes. He sent $16,900 to fund a jazz club he partially owned. He wired $11,000 to himself. He took out $15,000 in cash. And he transferred about $40,000 to other bank accounts he controlled. He did not use any of the money from Investor A to make the promised investments to be "authenticated through the European Central Bank."

46. When Investor A did not receive the first of her 12 promised $100,000 payments within the agreed 30 days, she inquired, but McKnight made excuses. Eventually, Investor A received the first $100,000 payment weeks after it was due. But then her next expected payment did not arrive on time. Eventually, Investor A received her second $100,000 payment weeks after it was due. McKnight then called Investor A and said that her "trade" had not taken place because she did not have the "right insurance." McKnight said he personally had been funding her payments and that she should be happy she doubled her investment. Investor A received no further payments from McKnight.

47. In reality there was no "trade" and the two payments McKnight made to Investor A were Ponzi payments made from funds McKnight raised from later investors.

### B. DEFENDANT SIMS BROUGHT INVESTORS INTO THE HYIP SCHEME

48. Sims met McKnight in 2016 through mutual associates in the Dallas, Texas metropolitan area. McKnight touted his international travel, supposed UN connections, philanthropic work, and banking relationships to Sims. McKnight later gave Sims his investment pitch, claiming he could pool investors' funds to generate exorbitant returns through vaguely described "trades" and "transactions." Sims reviewed promotional materials on CGE's website. After speaking with McKnight, meeting him personally, and taking note of his nice home, she believed the investment opportunities he offered were genuine.

49.    Sims did not understand the specifics of how McKnight invested money or generated promised returns.  But she believed that, through McKnight, she could give her friends and associates access to lucrative investments normally reserved for wealthier people while also earning some money herself.  Beginning in or around April 2018, Sims ultimately raised approximately $3.37 million for McKnight's fraudulent investments.

50.    McKnight used Sims as a buffer between himself and investors.  At McKnight's recommendation, Sims got a business card showing her association with CGE.  At times, she held herself out as the "Chief Asset Manager" of a CGE entity.  She had a CGE email address. Sims repeated McKnight's pitch to investors.  Despite no evidence supporting it, she claimed that she had had a positive experience with CGE and that it had generated significant returns in the past.

51.    Sims generally did not mention McKnight or his role in the investments to investors.  Sims sometimes funneled investors' money to McKnight through bank accounts she and her attorney controlled.  As a result, many of the investors Sims recruited were initially unaware of McKnight's relationship to CGE and their investments.

52.    During this period, Sims also operated a surety bond business through SGIT.  A surety bond is a promise to be liable for the debt of another.  SGIT typically wrote surety bonds on construction projects.  When McKnight learned of Sims's SGIT surety business, he was excited and said they could work together.  He proposed that SGIT could write surety bonds on investments people made with him and CGE.  Sims agreed, based on her belief that CGE was a legitimate investment firm making actual investments.  Several of the HYIP investors purchased surety bonds from SGIT and Sims.  The SGIT surety bonds purchased by these investors were designed to cover their principal investments in the event CGE failed to repay them.  The investors expected these bonds would safeguard their investments.  As explained below,

however, these surety bonds were worthless because SGIT had no real assets backing up its obligations.

**i.    THE SIMS CASH INVESTORS**

53.    Sims initially recruited 10 investors across several states to invest a total $1.73 million to McKnight and the CGE Group.  Some of these investors sent the money to CGE directly.  Others sent the money to Sims or her attorney, who then transferred the funds to McKnight and CGE.

54.    Like Investor A, many of these investors received a "Private Asset Management Agreement" describing their investments.  These agreements were either with CMcKnight Group Asset Management, LLC or CGAM, Inc. (collectively "CGAM").

55.    Under these agreements, investors entrusted CGAM to generate the promised returns and gave it discretionary authority to invest their money in nebulously described trades, transactions, and investment programs with the European Central Bank.  The agreements each promised a set monthly return, varying between 40 percent and 100 percent, for ten months.

56.    McKnight typically sent unsigned agreements to Sims for the investors' signatures and returned the agreements signed for CGAM.  McKnight signed the agreements for CGAM using the alias "Umberto Speranza."  On some of these agreements, Speranza is listed as President of CGAM, the same title McKnight is listed as holding for CGAM on the first agreement with Investor A.  At times, McKnight claimed to be Speranza when speaking with investors on the telephone.  McKnight used and controlled a CGE email address under Speranza's name.

57.    McKnight also communicated with these investors by telephone using the alias "Chris Miller" and by email using a Chris Miller email address.  Chris Miller purported to be

involved in putting together the promised "trades" and "transactions" with investors' funds to earn returns. Sims participated in calls in which McKnight impersonated Chris Miller.

58.     One investor recruited by Sims ("Investor B") received a $100,000 payment from CGE and McKnight, purportedly as a return on his investment. The payment, however, was not the result of legitimate investments. Instead, McKnight made the payment using funds deposited by other investors into his non-existent trading program. Believing he had realized a bona fide return on his initial investment, Investor B subsequently reinvested the $100,000 payment he received with McKnight.

59.     These Private Asset Management Agreements and the payments from CGE to the early investors persuaded Sims and others that CGE's and McKnight's investments were legitimate. Subsequently, using the same pitch, Sims recruited additional people who invested in what she thought was the same trading program. McKnight was also supposed to provide Private Asset Management Agreements to these later investors, but he never delivered the documents. He also did not make any further payments to any of these investors.

60.     In some instances, when McKnight failed to provide the promised agreements or otherwise fulfill the term of the investment agreement, Sims provided personal promissory notes to these investors. Sims also provided at least one investor with written asset management agreements in which her entity, SGIT, LLC, served as the private asset manager. Sims signed these agreements on behalf of SGIT, LLC. These agreements mirrored the CGAM Private Asset Management Agreements.

61.     All or most of each investor's money ultimately landed in bank accounts that McKnight controlled. McKnight did not invest this money as he promised. Rather, McKnight used this money for non-investment purposes, including Ponzi-like payments to other investors, personal expenses, and operating the jazz club he partially owned.

### ii.   THE SIMS PROPERTY INVESTORS

62.     Sims also solicited investors for a version of the HYIP Scheme created by McKnight involving the leveraging of real estate.  This scheme arose after McKnight asked Sims if she knew of anything he could borrow against and use the loan proceeds towards investments.  McKnight explained that the investment proceeds would pay back the loans and generate additional funds for the investors.

63.     From May to July 2018, Sims found three people with real estate they could use to invest in the scheme.  Sims again acted as middle-man between McKnight and these investors.  In this role, she relayed the transaction's details to investors for McKnight and helped complete the transaction documentation.  In each case, the purported investment would work the same way.

64.     Under the program, the three investors transferred their property titles into newly-formed trusts.  They appointed the president of CGE Real Estate Holdings, LLC (the "CGE Individual") as co-trustee over the property.  CGE then took out high-interest loans on the properties.  The loan proceeds were deposited into the bank accounts of CGE Real Estate Holdings, LLC ("CGE Real Estate").  CGE was supposed to invest the loan proceeds, and use the returns to pay off the loan and provide additional cash to the three property owners (the "Property Investors").

65.     The arrangement between CGE and two of the Property Investors was memorialized through written Asset Management Agreements between the investors' new trusts and an entity named CGE, Inc.  These agreements provided that the investors would receive $100,000 a month for six months.  Based on conversations with McKnight, Sims understood that investors would receive sufficient investment proceeds to pay off the loans, leaving the properties unencumbered at the end of the agreements' six month terms.  The investors also

19

understood that their homes would be unencumbered in the end.  McKnight sent the agreements to Sims by email.  The two formal agreements were purportedly signed by the CGE Individual.  He signed not on behalf of CGE, Inc., however, but on behalf of CGE Real Estate Holdings, LLC.  No signature line for CGE, Inc. was included in the agreements.

66.    In an email message between the CGE Individual and Sims containing a copy of one of the agreements, the CGE Individual writes, "I am CGE RE [Real Estate] Holdings.  The agreement was made between [investor] and CGE Incorporated, which I have no association."  At the end of the email he also writes "Ps. I know we need to keep it on the down low for now but that's not my signature."

67.    The third Property Investor was given an unsigned joint venture agreement with CGE Real Estate Holdings, LLC.  This agreement specified that CGE Real Estate Holdings, LLC could take out a loan of up to $500,000 against the investor's property.  In exchange, CGE Real Estate Holdings, LLC agreed to use the loan proceeds to pay off the loan and to pay the third Property Investor $100,000 a month for five months.

68.    Although the CGE Individual is listed as the owner of CGE Real Estate on many corporate documents, McKnight exercised control over CGE Real Estate and its bank accounts, while purportedly owning five percent of the entity.  McKnight was a signatory on CGE Real Estate's business checking account, and was listed on the signature card as "owner with control of entity."  McKnight had the CGE Individual write checks from another CGE Real Estate account to pay back a loan on McKnight's home.  McKnight told Sims that he would add her as a director of CGE Real Estate to facilitate her completion of paperwork for the property investments.  Indeed, in conversation with Sims, McKnight referred to CGE Real Estate as one of his entities.

69.     Ultimately, this scheme caused the Property Investors to incur hundreds of thousands of dollars in debt.  Loans were taken out against the three investors' properties for approximately (a) $560,000, (b) $780,000, and (c) $300,000, respectively.  CGE Real Estate received proceeds of approximately $1.37 million from the loans (after fees and other closing costs), but the proceeds were not invested in legitimate investments.  CGE Real Estate transferred one hundred thousand dollars of this money to F&M.  F&M used that $100,000 to make a Ponzi payment to Investor B, at McKnight's direction.  CGE Real Estate transferred at least $325,000 to the bank account of CMcKnight Group Enterprises, LLC.  Bank records show that CMcKnight Group Enterprises, LLC did not use the money for legitimate investment purposes, either.

70.     In July 2018, McKnight sent $750,000 of the loan proceeds through CGE to Relief Defendants AVP and Timothy Neher as an investment in a purported trading program that appears to have been remarkably similar to the one peddled by McKnight.  Neher spent this money on non-investment endeavors, including travel expenses, fancy restaurants, and other entertainment.  AVP and Neher never paid CGE any profits.  None of the $750,000 principal investment was ever returned to CGE.

71.     The Property Investors were never paid any profits.  McKnight and CGE Real Estate did not make the mortgage payments on the Property Investors' properties as promised.  Lenders later foreclosed on two of the properties.  One Property Investor ultimately lost her home to foreclosure.

72.     McKnight took responsibility for these transactions in numerous calls with Sims.  McKnight also entered into a settlement agreement with the third Property Investor whereby he promised to pay off the loan balance of more than $200,000 and make additional payments to the

third Property Investor of $208,000.  McKnight made one $6,000 payment as promised under the settlement agreement but failed to make any other payments.

73.    McKnight attempted to blame Neher for misappropriating all of the Property Investors' money.  At other times, McKnight claimed the attorneys at F&M had stolen the Property Investors' money.  He also bragged to Sims that no one would be able to find him.

**C.    THE HWIT INVESTORS**

74.    From April to June 2018, Promoter A raised more than $2 million from three investors for McKnight's fictitious HYIP trading program through the Heaven's Way Investment Trust ("HWIT").

75.    Promoter A met McKnight through mutual contacts.  At the time, McKnight claimed to be associated with the United Nations and said this position afforded him access to traders and credit lines he used to source lucrative investments.  McKnight gave Promoter A an investment pitch similar to the pitch he gave Investor A and Sims.  Based on McKnight's representations, Promoter A found three investors that deposited just over $2 million with HWIT (the "HWIT Investors").  Promoter A then caused HWIT to invest these funds in McKnight's purported trading program.  Because Promoter A and HWIT acted as middle men, the investors were initially unaware of McKnight's role in the transactions.

76.    Each HWIT Investor executed written agreements with HWIT.  Promoter A signed the agreements on behalf of HWIT.  The agreements stated that the investors engaged HWIT to "negotiate, structure and arrange Non-Recourse Project Funding by Private Lending Transactions."  The agreements promised investors would receive between 20 and 70 percent per month return on their investment for 10 months with the possibility of extending the term.

77.    Based on McKnight's instructions to Promoter A, the agreements instructed investors to deposit their investment money "into an Escrow Account with escrow agent Frost &

Miller, LLP". The HWIT agreements also stated that HWIT would arrange and pay for SGIT surety bonds to protect the investments from "theft and/or fraud" while those funds were in the possession of HWIT and F&M.

78.     HWIT entered into secondary agreements with CGAM for each investment. The investors did not see these secondary agreements. These agreements largely mirrored the main terms of the investor agreements. They explained that CGAM created the trading program and that it had the authority to enter trades and transactions with the money HWIT caused to be deposited into F&M's account to be held in escrow. These agreements also provided that CGAM would pay HWIT monthly returns of 100 percent per month.

79.     These secondary agreements also contained references to the SGIT surety bonds. The agreements stated that CGAM would provide a surety bond issued by SGIT to cover theft or fraud of the principal investment while the funds were in the possession of CGAM and F&M.

80.     The three HWIT investors invested their funds with CGAM and McKnight through four deposits made into F&M accounts. As explained in detail below, HWIT Investor 1 made an initial $200,000 deposit. Investor 2 made a $345,000 deposit, of which $140,000 was used by McKnight to make a Ponzi payment to HWIT Investor 1. This payment induced HWIT Investor 1 to make a subsequent $500,000 investment. HWIT Investor 3 made a $1 million investment, $140,000 of which was used to make another Ponzi payment to HWIT Investor 1. These investors' deposits were also used to fund Ponzi payments to Investor A.

81.     Promoter A signed the secondary agreements on behalf of HWIT. Although there was a signature box for McKnight to sign on behalf of CGAM as its President and CEO, McKnight never actually signed. McKnight nevertheless directed F&M to disburse the HWIT Investors' funds out of the F&M accounts immediately in accordance with his sole instruction.

82.     No investment profits were paid to the HWIT Investors.  The first HWIT Investor received two Ponzi payments totaling $280,000, which induced him to invest an additional $500,000.  Apart from these Ponzi payments, no HWIT Investor was ever repaid their principal investment amounts.  Instead, McKnight used their money for non-investment purposes, as detailed below.

83.     During conversations with Sims, Promoter A and/or investors, McKnight made excuses for the delays and often claimed that he had a deal or transaction that would imminently provide the investors' promised payments.  No such deal ever happened, however, and none of these investors have received such payments.  In other cases, McKnight told investors the originally intended transactions had failed—*i.e.*, that he had lost the money in legitimate investments that did not pan out as expected.  Yet as described above, the investors' money was never invested in any genuine transactions.

### D.     MILLER AND FROST & MILLER AIDED AND ABETTED  MCKNIGHT'S HYIP FRAUD

84.     As described above, McKnight directed that certain investor deposits into his HYIP Scheme be funneled through New York law firm Frost & Miller.  Defendant Miller and his sole partner at F&M were familiar with McKnight.  Miller and F&M had represented McKnight in various matters, including a lawsuit.  They also represented him on one or more failed transactions.  Miller and F&M had never been involved in a successfully completed transaction with McKnight.  They also knew that McKnight had been convicted of, and served jail time for, a drug-related offense.  By April 2018, McKnight owed F&M approximately $150,000 in overdue legal bills.

85.     Miller controlled F&M's bank accounts.  In late April 2018, McKnight called Miller out of the blue and informed him that investors would be wiring money to the firm's escrow account.  McKnight told Miller that it was within McKnight's sole discretion to direct the

expenditure of these funds, and that McKnight would be sending Miller instructions to wire the money back out of the F&M account.  McKnight also falsely told Miller that there was no escrow arrangement affecting the funds.

86.    Miller and F&M did not work on any aspect of any transaction giving rise to these investments.  They knew nothing about the circumstances under which investors were sending funds directly to their law firm, other than what McKnight relayed on the phone.  They did not know whether the firm's name was used in soliciting these investments.  They did not know what the investors expected F&M to do with these funds.  They received no explanation as to why the firm was receiving and distributing investor funds with no apparent substantive role to play.  They did, however, have an understanding that McKnight preferred to involve law firms in his deals because he believed investors were more comfortable sending their money to a reputable law firm than directly to McKnight.

87.    Despite these suspicious circumstances, Miller did not perform any diligence on the underlying transactions.  He made no attempt to communicate with the investors sending over $2 million to the firm's bank accounts.  He did not attempt to discern what function the investors expected F&M to serve.  He did not attempt to obtain or review any underlying investment agreements.  If he had, Miller would have learned of F&M's important role in McKnight's scheme, including that the agreements identified F&M as "escrow agent."  Miller did not ask why McKnight wanted to effect these in-and-out transactions, which had no clear economic purpose, cost F&M money in wire transfer fees, and presented indicia of potential money laundering.  Miller did not question how the funds could be both for investment purposes and, at the same time, within McKnight's sole control and discretion to distribute.  Nor did Miller question whether investors knew McKnight directed F&M to keep $76,000 of their funds

to pay McKnight's overdue legal bills when F&M performed no services in connection with their investment.

88.     Instead of performing any degree of diligence, Miller blindly followed McKnight's instructions.  By accepting the HWIT Investors' funds into the firm's bank accounts and then disbursing those funds pursuant to McKnight's sole instruction without question, Miller and F&M abdicated control over the firms' bank accounts to McKnight and knowingly or recklessly facilitated transactions that furthered McKnight's fraud.  Miller and F&M also misappropriated investor funds when they retained $76,000 in HWIT Investors' funds solely at McKnight's instruction.

89.     HWIT Investors sent four wires totaling $2.045 million to F&M over the course of six weeks.  McKnight instructed Promoter A to have investors deposit money into the F&M accounts and tell them the funds would be held in escrow.  McKnight, however, provided the coordinates for the F&M operating account.  Following the first deposit, Miller instructed McKnight to send future deposits to the firm's IOLTA account.[2]  Despite these instructions, two more investor deposits went into the operating account.  The last deposit went into the firm's IOLTA account.  In each instance, with the exception of the $76,000 F&M retained, Miller almost immediately transferred the money back out under McKnight's instructions.

90.     The incoming and outgoing wires passing through F&M's bank accounts associated with the four HWIT transactions are detailed below:

---

[2] In New York these attorney trust accounts are called "Interest on Lawyer Accounts" or "IOLA accounts," which is the term F&M uses.

**F&M ACCOUNTS: HWIT TRANSACTION #1**

| Incoming/ Outgoing | Date | Amount | Sender | Recipient | Purpose |
|---|---|---|---|---|---|
| *Incoming* | 4/27/2018 | **$200,000** | HWIT Investor 1 | F&M Operating Acct | For investment in HWIT paying 70% per month for 10 months; Wire Reference: HWIT-MJC-DB-4-23 |
| *Outgoing* | 4/27/2018 | **$185,000** | F&M Operating Account | CMcKnight Group Enterprises, LLC | Payment to McKnight's account |
| *Outgoing* | 4/27/2018 | **$15,000** | F&M Operating Account | F&M | Purportedly for payment on past due legal fees |

**F&M ACCOUNTS: HWIT TRANSACTION #2**

| Incoming/ Outgoing | Date | Amount | Sender | Recipient | Purpose |
|---|---|---|---|---|---|
| *Incoming* | 6/14/2018 | **$345,000** | HWIT Investor 2 | F&M Operating Acct | For investment with HWIT paying 50% per month for ten months; Wire Reference: HWIT ANN AMA 345K |
| *Outgoing* | 6/14/2018 | **$140,000** | F&M Operating Account | HWIT Investor 1 | Ponzi-like payment of 70% return on HWIT Transaction #1 |
| *Outgoing* | 6/14/2018 | **$20,000** | F&M Operating Account | Promoter A | Compensation to HWIT |
| *Outgoing* | 6/14/2018 | **$20,000** | F&M Operating Account | Boiler Room Holdings | Finder's fee to Promoter A's associate |
| *Outgoing* | 6/14/2018 | **$144,000** | F&M Operating Account | CMcKnight Group Enterprises, LLC | Payment to McKnight's account |
| *Outgoing* | 6/14/2018 | **$21,000** | F&M Operating Account | F&M | Purportedly for payment on past due legal fees |

### F&M ACCOUNTS: HWIT TRANSACTION #3

| Incoming/ Outgoing | Date | Amount | Sender | Recipient | Purpose |
|---|---|---|---|---|---|
| **Incoming** | 6/25/2018 | **$500,000** | HWIT Investor 1 | F&M Operating Acct | For second investment in HWIT paying 50% per month for ten months; Wire Reference: HWIT-MJC-DB-6-22 |
| **Outgoing** | 6/26/2018 | **$485,000** | F&M Operating Account | CMcKnight Group Enterprises, LLC | Payment to McKnight's account |
| **Outgoing** | 6/26/2018 | **$15,000** | F&M Operating Account | F&M | Purportedly for payment on past due legal fees |

### F&M ACCOUNTS: HWIT TRANSACTION #4

| Incoming/ Outgoing | Date | Amount | Sender | Recipient | Purpose |
|---|---|---|---|---|---|
| **Incoming** | 8/3/2018 | **$1,000,000** | HWIT Investor 3 | F&M IOLTA Acct | For investment with HWIT paying 20% per month for ten months; Wire Reference: HWIT/VENCAP/7-2718-1M/PPP |
| **Outgoing** | 8/3/2018 | **$334,174.86** | F&M IOLTA Account | Title Company | Payment on McKnight personal home |
| **Outgoing** | 8/3/2018 | **$140,000** | F&M IOLTA Account | HWIT Investor 1 | Ponzi-like payment of 70% return on HWIT Transaction #1 |
| **Outgoing** | 8/3/2018 | **$100,000** | F&M IOLTA Account | Investor A | Ponzi-like payment |
| **Outgoing** | 8/3/2018 | **$40,000** | F&M IOLTA Account | Promoter A | Compensation to HWIT |
| **Outgoing** | 8/3/2018 | **$20,000** | F&M IOLTA Account | Boiler Room Holdings | Finder's fee for Promoter A's associate |
| **Outgoing** | 8/3/2018 | **$80,000** | F&M IOLTA Account | Attorney for SGIT | Payment to SGIT for Sims surety bonds |
| **Outgoing** | 8/3/2018 | **$260,825.14** | F&M IOLTA Account | CMcKnight Group Enterprises, LLC | Payment to McKnight's account |

| *Outgoing* | 8/3/2018 | **$25,000** | F&M IOLTA Account | F&M | Purportedly for payment on past due legal fees |
|---|---|---|---|---|---|

91.    Miller and F&M encountered and ignored multiple additional red flags regarding these banking transactions.  First, they did not question why a client they had never known to successfully complete a transaction, who owed them more than $150,000 in overdue legal fees, and who they knew had a past history of incarceration for drug charges would suddenly have over $2 million at his personal disposal.  Second, none of the wire confirmations made any reference to McKnight or CGE or otherwise indicated that the funds belonged to McKnight. Instead, each wire confirmation contained a similar transaction code starting with "HWIT." Miller did not know anything about HWIT, and he did not ask McKnight or the investors what it was.  Third, F&M made payments to the first HWIT investor out of the deposits made by the second and third HWIT investors.  While the name of the account making the first HWIT deposit and the account receiving the two payments were not identical, they were very similar.  If Miller and F&M had exercised basic due diligence, they would have learned that McKnight was using HWIT Investor 2's and 3's money to make payments to HWIT Investor 1—*i.e.*, F&M was facilitating Ponzi payments.  Fourth, Miller sent money twice to an entity named "Boiler Room Holdings," which he conceded was a bad name for an investment company.

92.    McKnight made at least four Ponzi payments using the HWIT Investors' funds deposited into the F&M accounts.  First, as shown above, he had F&M send HWIT Investor 1 two $140,000 payments from the money deposited by HWIT Investors 2 and 3, respectively. Next, McKnight directed F&M to send Investor A another $100,000 from the $1 million deposit made by HWIT Investor 3.  Finally, after F&M transferred $485,000 to CMcKnight Group

Enterprises, LLC from HWIT Investor 1's second deposit, McKnight used part of those funds to send another $100,000 payment to Investor A.

93.    Miller and F&M ignored a myriad of red flags and recklessly followed McKnight's instructions to disburse over $2 million in investor funds, including to themselves, despite recognizing that the investors were taking comfort in the fact that they had sent their money to a law firm rather than to McKnight directly.  The HWIT Investors took this comfort because they believed the lawyers would perform some level of diligence and safeguard their funds.  The investors' faith in Miller and Frost & Miller was misplaced.  Knowing investors took comfort in the fact that F&M was involved in receiving their funds, but taking no substantive role with respect to the funds, Miller and F&M gave McKnight's scheme an air of legitimacy that enabled his deception.

### F.    SIMS AIDED AND ABETTED MCKNIGHT'S HYIP SCHEME

94.    Sims helped McKnight and CGE carry out the HYIP Scheme by soliciting investors, purporting to be associated with CGE, vouching for CGE's investment track record despite having no evidence to support it, moving investors' money through bank accounts to McKnight, and issuing surety bonds through SGIT that investors relied upon when making their HYIP investments.  Sims ignored red flags that should have alerted her that McKnight was a fraud, including McKnight's vague descriptions of how he would invest the money.  Sims never questioned why McKnight seemed reluctant to directly speak with investors himself.  When investors raised concerns about their investments, Sims set up conversations between investors and McKnight during which McKnight used aliases, including the names Chris Miller and Umberto Speranza.  Sims participated in these conversation and never told investors that they were truly speaking with McKnight.

95.     Sims also recklessly caused SGIT to issue surety bonds to McKnight HYIP investors that proved to be worthless.  Sims represented that SGIT had hundreds of millions of dollars in government bonds backing its surety bond obligations.  SGIT held a third-party valuation attesting to the government bonds' value and recklessly relied on this valuation.  The bonds were effectively gifted to SGIT, but Sims never sought a second opinion, sought to sell any of the bonds, or otherwise verified their valuation.  In reality, the bonds SGIT held as collateral against its surety obligations had no meaningful value.  Thus, SGIT did not have the financial capacity to satisfy its surety bond obligations.

96.     When the McKnight investments failed, several investors called the SGIT bonds.  But SGIT did not pay the investors their money back for their lost investments.  Sims and SGIT claimed that some or all of the surety bonds were invalid because McKnight and CGE never invested the funds as promised.  Sims later refunded some of the bond fees the investors paid to SGIT.  She also used her own funds to repay monies invested by several of the people she solicited.

97.     McKnight repeatedly told Sims that he was working hard to complete deals or transactions to repay investors.  Sims herself gave McKnight more than $800,000—including through mortgages taken out on her properties and the sale of an automobile—to help him complete a deal that, according to McKnight, would enable him to pay people back.  This deal never came through, and Sims lost her money, her car, and her home.

## II.     THE RIA SCHEME: MCKNIGHT DEFRAUDS RIA CLIENT OF $2.3 MILLION

98.     In 2019, an SEC-registered investment advisor ("RIA") in North Carolina and its principal member ("RIA Partner") were seeking alternative-investment opportunities to buoy the RIA's business.  RIA Partner was working with an individual ("RIA Associate") to identify such opportunities.  In January 2019, RIA Partner and RIA Associate had formalized their alternative-

investment business relationship by forming an LLC ("LLC A").  RIA Partner and RIA

Associate served as LLC A's effective co-owners and co-managers.

99.    In or around April 2019, RIA Associate introduced McKnight to RIA Partner.

RIA Partner believed McKnight was a "financier of some type, issuing . . . medium-term note

offerings" through his CGE group of companies.  Soon thereafter, McKnight unexpectedly called

RIA Partner on a Saturday.  McKnight explained that he urgently needed $2.3 million to pay an

insurance premium in order to complete a $450 million medium-term note offering.  RIA Partner

understood that paying the insurance premium was the last step needed to complete the offering.

100.    RIA Partner and McKnight discussed this alternative-investment opportunity.

McKnight requested an investment of $2.3 million to pay the insurance premium for the $450

million note offering.  McKnight promised to repay the $2.3 million, plus a $1 million return, out

of the note-offering proceeds within 60 days.  RIA Partner understood that McKnight would

make $10 to $15 million in the offering.  The $1 million return would come from McKnight's

profits.  In further discussions over the deal, McKnight also agreed that LLC A would receive a

distribution or profit from the transaction.

101.    McKnight told RIA Partner the medium-term note was intended to fund a U.S.

coal mining and natural resources company (the "Coal Company").  The assets and operations of

the Coal Company would theoretically fund repayment of the note's principal and interest.

McKnight had been advised that the Coal Company's collateral and cash flows were insufficient

to support the note.  As a result, selling the note would be difficult, if not impossible.

McKnight's solution was to attempt to "wrap" the note with an insurance policy that would

provide the note with credit enhancement.  McKnight said he did not have the money needed to

pay the insurance premium, and therefore was seeking an investor from the RIA.

102.    McKnight supported his representations with a safekeeping receipt ("SKR")
proclaiming that CGE controlled a large quantity of physical gold that it could use as collateral.
The SKR stated that 12,500 kilograms of physical gold had been placed in the custody of an
Australian vault where it was being held for "Safekeeping" for its owner, CGE Asset
Management, LLC.  12,500 kilograms of gold was worth more than $806 million as of April 1,
2019.  McKnight used this SKR, dated January 25, 2019, as proof of funds.  He also presented
RIA Partner with a letter from F&M dated May 3, 2019, that purported to confirm the veracity of
the SKR.

103.    Insurance Company A, located in Colombia, had agreed to write an insurance
policy on some portion of the note for a premium of $2.3 million.  McKnight supported the
insurance request with the same gold SKR that he presented to RIA.  Insurance Company A's
decision to write the insurance was based, at least in part, on McKnight's representation that part
of the note they were insuring was collateralized by a large quantity of physical gold.

104.    On May 3, 2019, McKnight executed a written Deed of Assignment for the
benefit of LLC A, ostensibly collateralizing the $2.3 million investment by assigning to LLC A
$2.3 million of the gold that CGE Asset Management, LLC supposedly held.  McKnight
personally signed the Deed of Assignment.  The Deed of Assignment represented that CGE
Asset Management, LLC owned the gold SKR and that the SKR was "unencumbered and free,
clean and clear of any liens or claims."

105.    RIA Partner relied on the legitimacy of the SKR and the existence of the physical
gold when agreeing to provide McKnight the $2.3 million for the insurance premium.  RIA
Partner solicited one of RIA's client's ("Investor R," a married couple) to make the $2.3 million
investment.  RIA Partner told Investor R the investment was "very small" risk due to the gold
SKR collateralizing the funds.  Investor R in turn relied on the legitimacy of the SKR and the

33

existence of the physical gold when agreeing to invest.  When asked why he was willing to pay a $1 million return for what looked like a no-risk investment, McKnight said he needed the money and was pressed for time.  Both RIA Partner and Investor R accepted this explanation.

106.    RIA Partner and RIA structured the investment through a newly formed limited liability company ("LLC B").  Under the terms of LLC B's agreement, LLC A managed LLC B and held all of its Class A interests.  Investor R was a passive investor in LLC B's Class B interests.  LLC A made no capital contribution to LLC B.  The only capital contribution to LLC B was Investor R's investment of $2.3 million.  The LLC B agreement provided that Investor R's profits earned on the investment would be distributed according to a multi-step waterfall formula.  The formula prioritized paying Investor R up to 143.479 percent of the $2.3 million investment (*i.e.*, $3.3 million).  It then entitled LLC A to any remaining profits.

107.    McKnight personally executed a written Guarantee Agreement for LLC B, also dated May 3, 2019.  In that Agreement, CGE Asset Management, LLC purported to guarantee LLC B payment of up to $2.3 million in gold bullion in the event LLC B did not have sufficient funds to repay its investor their principal investment of $2.3 million by July 3, 2019.  The gold SKR and the May 3, 2019 Deed of Assignment assigning $2.3 million of that gold to LLC A were attached as exhibits to the Guarantee Agreement as security.  These documents and the LLC B agreement were the only documents memorializing the transaction.  The parties never memorialized in writing McKnight's promise of a $1 million return on the $2.3 million investment.

108.    On May 3, 2019, Investor R bought all of LLC B's Class B interests for $2.3 million.  LLC A transferred that $2.3 million to McKnight's entity CGE Asset Management, LLC, so it could purchase the insurance policy for the $450 million note.  Investor R played no

active role in the deal.  Investor R's expected profits would come solely from the efforts of the RIA, RIA Partner, LLC A, and McKnight.

109.    McKnight misappropriated most of the money within days of receiving it.  He sent only $900,000 of the $2.3 million to Insurance Company A.  He indirectly funneled $100,000 to RIA Associate for introducing him to the RIA.  McKnight misappropriated the remainder of the money, spending it on non-insurance purposes.  For example, McKnight used $36,000 to operate a jazz club he partially owned.  He used $25,000 to repay a pawn shop loan.  He sent $500,000 to an entity affiliated with the Coal Company.  And he sent $3,000 to his mother.  McKnight admitted to an individual connected to Insurance Company A that he used much of the $2.3 million investment funds for non-insurance purposes.

110.    Neither Investor R nor LLC A received any profits from the investment.  No amount of the $2.3 million principal was ever repaid.  Investor R lost their full $2.3 million investment.  The $450 million note was never issued.

111.    RIA Partner looked into making a claim on the SKR, but was not able to do so.  The SKR was completely false.  There was no gold protecting the investment.  Only July 8, 2019, LLC A and LLC B attempted to recover the investment by suing McKnight and his businesses.  McKnight defaulted.g

## III.    THE PPE SCHEME: INVESTORS DEFRAUDED OF $555,000

112.    In 2021, a newly formed personal protective equipment manufacturing company (the "PPE Company") was seeking funding to construct a nitrite glove factory.  McKnight told representatives of the PPE Company that his firm, BPM Global, could raise $300 million for the PPE Company through a $300 million bond offering.  McKnight said he and BPM Global already had buyers willing to fund the $300 million bond.  McKnight told the PPE Company representatives that all the PPE Company had to do was raise $3 million to pay a one percent

"bond fee" for the deal.  When the PPE representatives explained they could not raise $3 million, McKnight said they need only raise $1 million.  McKnight said the other $2 million would be taken out of the bond proceeds.

113.    Based on McKnight's representations, a PPE Company representative ("PPE Representative") recruited eleven of his friends and family (the "PPE Company Investors") to provide McKnight and BPM Global the funds for the bond fee.  In exchange for investing funds to pay the bond fee, McKnight promised investors would be paid ten times their investment (*i.e.*, a 1,000 percent return) within a maximum of 45 days.

114.    When PPE Representative was only able to raise $555,000 for the bond fee, McKnight said that was enough.  McKnight said he and his company, BPM Global, would take the remainder of the fee from the bond proceeds.

115.    BPM Global memorialized its agreements with the PPE Company Investors in two documents in September 2021.  The investors received these documents from McKnight through PPE Representative.

116.    One document was an invoice entitled, "BPM Global Investments, LLC, Bond Program and Issuance."  The invoice noted the $300 million bond offering and the one percent total bond fee of $3 million.  It then stated the amount the investor was contributing.  It directed the investor to wire their funds to BPM Global's counsel.  The invoice promised full repayment by BPM Global within 72 hours upon written request from the investor if the bond did not come to fruition.  It stated that such written requests should be sent to McKnight, who was listed as "Fund Advisor" to the PPE Company.  At the bottom of the invoice was a signature block for the investor.  There was also a signature block for "Harmony Brooke," COO, on behalf of BPM Global.

117.    BPM Global and the investors also executed a Guarantee of Repayment.  This document stated that PPE Company had successfully raised $300 million via BPM Global's Corporate Bond Structure.  It explained that PPE Company had opted to "temporarily welcome private capital to assist in satisfying its bond fee obligation."  It stated that "BPM Global is providing the creation, issuance, and end buyer for [PPE Company's] bond, thus the bond will not need to be traded on the open market in order to fund."  It recorded the specific amount of money the investor was depositing on behalf of PPE Company to assist it with its bond fee obligation.  The document also stated that the investor's total return, including both principal and return on investment, would be an amount ten times that of their principal investment.  It further stated that the projected disbursement of funds to the investor "shall be within 35 days, a maximum of 45 days," following the investor's deposit.

118.    Like the invoice, the Guarantee of Repayment promised full repayment by BPM Global within 72 hours upon written request from the investor if the bond did not come to fruition.  It stated that such written requests should be sent to McKnight, Fund Advisor to the PPE Company, at his email address with a domain of BPMAssetManagment.com, and to Harmony Brooke, COO for BPM Global, at her email address with a domain of BPMAssetManagment.com.  At the bottom of the Guarantee of Repayment was a signature block for "Harmony Brooke," COO, on behalf of BPM Global.  There was also a signature block for the investor.

119.    Harmony Brooke is an alias for McKnight's sister, Defendant Harmony Brooke McKnight.  Harmony Brooke's signature appears on a number of the executed documents.

120.    Harmony McKnight opened bank accounts in the name of BPMAM and BPM Global.  Both McKnight and Harmony McKnight opened at least one bank account together in the name of BPM Global.  At times, Harmony McKnight actively used these accounts.  She also

allowed McKnight to control the flow of funds into and out of these accounts. Harmony McKnight signed documents for the BPM Entities using her alias, Harmony Brooke.

121.    Eleven individual investors sent a total of $555,000 to BPM Global's counsel in accordance with their agreements with BPM Global to help fund the bond fee for the $300 million PPE Company bond offering. These PPE Company Investors played no active role in executing the offering. Their expected profits would come solely from the efforts of McKnight, Harmony McKnight, the BPM Entities, and PPE Company.

122.    The investors understood BPM Global's counsel would hold their deposits in escrow. This fact gave the investors assurance that their money was safe. BPM Global's counsel sent the funds to BPMAM bank accounts under McKnight's and Harmony McKnight's control, however. BPMAM in turn sent a portion of these funds to BPM Global.

123.    BPM Global's counsel represented McKnight and the BPM Entities. He considered McKnight to be in control of the Entities, and he interacted exclusively with McKnight.

124.    McKnight, Harmony McKnight, and the BPM Entities did not use the money for any activities connected to the PPE Company. Rather, they used the investors' funds for personal purposes, including restaurant charges, UBER charges, Zelle transfers to friends and family, and payments to a football program associated with McKnight's son.

125.    The PPE Company bond never came to fruition. McKnight never had buyers willing to pay $300 million for the PPE Company bond.

126.    McKnight and BPM Global failed to make any of the promised payments to investors. No investor received any profits from their investment. No amount of their principal investments was ever repaid. The PPE Company Investors lost their full $555,000 combined investment.

127.    Investors later sent demand letters to McKnight, Harmony McKnight, BPM Global, and BPM Global's counsel.  McKnight refused to refund the investors' money.  He alleged he did not owe the investors any money back because they were supposed to raise $1 million, but only raised half; therefore, he could not complete the transaction.

\* \* \*

128.    McKnight's three fraudulent schemes are summarized in the chart below for ease of reference:

| Scheme | Time Period | Defendants / Relief Defendants Involved | Approximate Number of Investors | Approximate Investor Funds Received | Purported Investment Opportunity |
|---|---|---|---|---|---|
| **HYIP Scheme** | March 2018 – April 2019 | • McKnight • Sims • Miller and F&M • Neher and AVP | 16 | $5,585,000 | Investment in a "trading program" through CGE, McKnight's purported boutique asset management firm |
| **RIA Scheme** | April 2019 – May 2019 | • McKnight | 1 | $2,300,000 | Investment to fund an insurance policy needed to close a purported $450 million note offering for a coal company |
| **PPE Scheme** | September 2021 | • McKnight • BPM Global • BPMAM • Harmony McKnight | 11 | $555,000 | Investment to pay a "bond fee" required to complete a purported $300 million bond offering for a PPE company |

## CLAIMS FOR RELIEF

### CLAIM ONE
**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**
**(Against Defendant McKnight in the HYIP, RIA, and PPE Schemes and**
**Defendant BPM Global in the PPE Scheme)**

129.    The Commission realleges and incorporates by reference the allegations contained in paragraphs 1-128 above.

130.    By engaging in the acts and conduct alleged herein, Defendants McKnight and BPM Global, directly or indirectly, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

a.    knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

b.    knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material facts, or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.    knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

131.    By reason of the foregoing, Defendants McKnight and BPM Global have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### CLAIM TWO
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]**
**and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**
**(Against Defendant McKnight in the HYIP, RIA, and PPE Schemes and**
**Defendant BPM Global in the PPE Scheme)**

132.    The Commission realleges and incorporates by reference the allegations contained in paragraphs 1-128 above.

133.    By engaging in the conduct described above, Defendants McKnight and BPM Global, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of a means or instrumentality of interstate commerce, or of the mails, have:

   a.    employed a device, scheme, or artifice to defraud; and/or

   b.    made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c.    engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon another person.

134.    Defendants McKnight and BPM Global engaged in the above-referenced conduct knowingly or with severe recklessness.

135.    By reason of the foregoing, Defendants McKnight and BPM Global have violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**CLAIM THREE**
**Violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)]**
**(Against Defendant BPMAM in the PPE Scheme)**

136.    The Commission realleges and incorporates by reference the allegations contained in paragraphs 1-128 above.

137.    By engaging in the acts and conduct alleged herein, Defendant BPMAM, directly or indirectly, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has:

    a.      knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

    b.      knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

138.    By reason of the foregoing, Defendant BPMAM has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## CLAIM FOUR
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) & (c) thereunder [17 C.F.R. § 240.10b-5] (Against Defendant BPMAM in the PPE Scheme)

139.    The Commission realleges and incorporates by reference the allegations contained in paragraphs 1-128 above.

140.    By engaging in the conduct described above, Defendant BPMAM, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or the mails, has:

    a.      employed a device, scheme, or artifice to defraud; and/or

    b.      engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

141.    Defendant engaged in the above-referenced conduct knowingly or with severe recklessness.

142.    By reason of the foregoing, Defendant BPMAM has violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**CLAIM FIVE**
**Aiding and Abetting Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**
**(Against Defendants Sims, F&M, and Miller in the HYIP Scheme**
**and Defendant Harmony McKnight in the PPE Scheme)**

143.    The Commission realleges and incorporates by reference the allegations contained

in paragraphs 1-128 above.

144.    As alleged above, Defendants McKnight, BPM Global, and BPMAM each

violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].  Defendants Sims, F&M, and

Miller knowingly or recklessly provided substantial assistance to McKnight's violations of

Section 17(a) in the HYIP Scheme.  Defendant Harmony McKnight knowingly or recklessly

provided substantial assistance to Defendants McKnight's, BPM Global's, and BPMAM's

violations of Section 17(a) in the PPE Scheme.

145.    By reason of the foregoing, Section 15(b) of the Securities Act [15 U.S.C.

§ 77o(b)] deems each of Defendants Sims, F&M, Miller, and Harmony McKnight to be in

violation of Section 17(a) of the Securities Act to the same extent as the others to whom such

assistance by each of them was provided, and unless enjoined, each of them will again aid and

abet violations of Section 17(a).

**CLAIM SIX**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act**
**(Against Defendants Sims, F&M, and Miller in the HYIP Scheme**
**and Harmony McKnight in the PPE Scheme)**

146.    The Commission realleges and incorporates by reference the allegations contained

in paragraphs 1-128 above.

147.    As alleged above, Defendants McKnight, BPM Global, and BPMAM each

violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)].  Defendants Sims, F&M, and

Miller knowingly or recklessly provided substantial assistance to McKnight's violations of

Section 10(b) in the HYIP Scheme.  Defendant Harmony McKnight knowingly or recklessly

provided substantial assistance to Defendants McKnight's, BPM Global's, and BPMAM's violations of Section 10(b).

148.    By reason of the foregoing, Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] deems each of Defendants Sims, F&M, Miller, and Harmony McKnight to be in violation of Section 10(b) of the Exchange Act to the same extent as the others to whom such assistance by each of them was provided, and unless enjoined, each of them will again aid and abet violations of Section 10(b).

### CLAIM SEVEN
### Control Person Liability Under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]
### (Against McKnight and Harmony McKnight in the PPE Scheme)

149.    The Commission realleges and incorporates by reference the allegations contained in paragraphs 1-128 above.

150.    By engaging in the conduct described above, Defendants McKnight and Harmony McKnight directly or indirectly controlled each of Defendants BPM Global and BPMAM and at no point in time acted in good faith.

151.    As alleged above, Defendants BPM Global, and BPMAM each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

152.    By reason of the foregoing, Defendants McKnight and Harmony McKnight are liable as controlling persons for the securities violations committed by Defendants BPM Global and BPMAM to the same extent as those entities are liable pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

## CLAIM EIGHT
**Disgorgement From Relief Defendants Under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(5)]
(Against Relief Defendants Neher and AVP)**

153.    The Commission realleges and incorporates by reference the allegations contained in paragraphs 1-128 above.

154.    Relief Defendants Neher and AVP received, directly or indirectly, funds or other property from Defendant McKnight, which are either the proceeds of, or are traceable to the proceeds of, unlawful activities alleged in this Complaint to which they have no legitimate claim.

155.    By reason of the foregoing, it would be inequitable for Relief Defendants to retain the proceeds from violations of the federal securities laws and such proceeds should be disgorged.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

### I.

Finding that Defendants violated the federal securities laws alleged in the Complaint;

### II.

Permanently restraining and enjoining Defendants McKnight, Sims, F&M, Miller, BPM Global and Harmony McKnight and all persons in active concert or participation with them, from, directly or indirectly, violating Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)];

### III.

Permanently restraining and enjoining Defendant McKnight, directly or indirectly, including, but not limited to, through any entity he owns, operates, manages or controls, from

45

participating in the structuring, issuance, purchase, offer, or sale of any security or soliciting any person or entity to purchase or sell any security; provided however, that such injunction shall not prevent McKnight from purchasing or selling securities for his own personal account;

**IV**.

Permanently restraining and enjoining Defendant Sims from directly or indirectly, including, but not limited to, through any entity owned or controlled by Sims, (i) soliciting any person or entity to purchase or sell any security, or (ii) offering, issuing, or writing surety bonds or other guarantees in connection with any purchase or sale of a security; provided, however, that such injunction shall not prevent Sims from purchasing or selling securities for her own personal account;

**V.**

Permanently restraining and enjoining Defendant BPMAM and all persons in active concert or participation with them, from, directly or indirectly, violating Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

**VI.**

Ordering Defendants McKnight, F&M, Miller, Harmony McKnight, BPM Global, and BPMAM to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the violations alleged herein, pursuant to Sections 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d) (3), (5) and(7)];

**VII.**

Ordering Defendants McKnight, Sims, F&M, Miller, Harmony McKnight, and BPM Global, and BPMAM to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VIII.**

Permanently prohibiting Defendants McKnight, Sims, Miller, and Harmony McKnight, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

**IX.**

Ordering the Relief Defendants to disgorge, with prejudgment interest, all ill-gotten gains received or derived from the activities set forth in this Complaint, and to repatriate any ill-gotten funds or assets sent overseas;

**X.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**XI.**

Granting such other and further relief as the Court may deem just, proper, and equitable.

Dated: March 23, 2023                    Respectfully submitted,

                                         **UNITED STATES SECURITIES
                                         AND EXCHANGE COMMISSION**


                                         _____
                                         Anna O. Area
                                         Application for Admission *pro hac vice* pending
                                         District of Columbia Bar No. 987572
                                         Trial Counsel

47

U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549-5977
Telephone: (202) 551-6417
areaa@sec.gov

David Reece
Local Counsel
Texas Bar No. 24002810
Trial Counsel
U.S. SECURITIES AND EXCHANGE COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-6476
Facsimile:  (817) 978-4927
reeced@sec.gov

Attorneys for Plaintiff

<u>Of Counsel</u>
Jason Anthony
Michael Flanagan
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549-5977