IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, PLAINTIFF, | § § § § | |
| V. | § § | CIVIL CASE NO. 3:23-CV-641-L-BK |
| AARON CAIN MCKNIGHT; BPM GLOBAL INVESTMENTS, LLC; BPM ASSET MANAGEMENT, LLC; SHERRY REBEKKA SIMS; KENNETH MILLER; FROST AND MILLER, LLP; AND HARMONY BROOKE MCKNIGHT, DEFENDANTS, | § § § § § § § § § | |
| AND | § § | |
| ACCELERATED VENTURE PARTNERS, LLC, AND TIMOTHY NEHER, RELIEF DEFENDANTS. | § § § | |

FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b) and the district judge's *Order of Reference*, Doc. 23,

*Defendants Frost & Miller, LLP and Kenneth Miller's Motion to Dismiss the Securities and*

*Exchange Commission's Complaint*, Doc. 22, is before the undersigned magistrate judge for

findings and a recommended disposition. As detailed here, the motion should be **DENIED**.

## I. BACKGROUND

In March 2023, the Securities and Exchange Commission ("SEC") filed an eight-count

complaint against Aaron C. McKnight ("McKnight"), his associates, and various entities under

his control. Doc. 1, *passim*. The SEC additionally sued Frost & Miller, LLP ("F&M"), a two-

person New York law firm, and Kenneth Miller ("Miller"), an attorney and principal at F&M (collectively, "the F&M Defendants").  Doc. 1 at 7.  The SEC alleges that McKnight and his associates perpetrated a Ponzi scheme from approximately March 2018 to September 2021, defrauding approximately 28 investors out of more than $8.4 million through various fraudulent schemes, one of which was a "high-yield investment trading program" scheme (the "HYIP Scheme").[1]  Doc. 1 at 2, 10-31.  In brief, the SEC alleges that the F&M Defendants aided and abetted McKnight in the HYIP Scheme by recklessly funneling over $2 million in investor funds through their law firm accounts directly to McKnight and allowing the accounts to be used in furtherance of McKnight's fraudulent investment scheme.  Doc. 1 at 24-30.  The complaint sets forth the following allegations pertaining to the F&M Defendants and their involvement in the HYIP Scheme:

- From March 2018 to April 2019, McKnight carried out the HYIP Scheme by posing as an investment professional running several investment entities collectively called the "CGE Group." Doc. 1 at 2, 10.  Investors committed their principal investment for a number of months "on the promise that they would be paid monthly returns ranging from 40 to 100 percent of their initial investment each month for ten to twelve months."  Doc. 1 at 10.  McKnight represented that these "exorbitantly high returns" would be generated by his "trading program."  Doc. 1 at 10.

- McKnight, working through two intermediaries who interacted directly with investors, raised more than $2 million from three investors for his fictitious HYIP trading program via an entity named Heaven's Way Investment Trust ("HWIT").  Doc. 1 at 9-10, 22.  "Each HWIT investor executed written agreements with HWIT . . . [that] promised investors would receive between 20 and 70 percent per month return on their investment for 10 months with the possibility of extending the term."  Doc. 1 at 22.  However, "[n]o investment profits were paid to the HWIT Investors."  Doc. 1 at 24.  Instead, McKnight used their money for non-investment purposes, including making Ponzi payments, a down payment on his personal home, and payments to F&M for unrelated overdue legal bills.  Doc. 1 at 3, 24-26, 28.

---

[1] "A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses."  *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 189 n.1 (5th Cir. 2013) (citation omitted).

- As part of the fraudulent operation, McKnight directed that certain investor deposits into his HYIP Scheme be "funneled through" F&M. Doc. 1 at 24. Specifically, the agreements each investor signed with HWIT instructed them to deposit their investment money "into an Escrow Account with escrow agent Frost & Miller, LLP." Doc. 1 at 22-23. The agreements also provided that HWIT would arrange and pay for "surety bonds" to protect the investments from "theft and/or fraud" while those funds were in HWIT and F&M's possession. Doc. 1 at 23. HWIT would then enter into secondary agreements as to each transaction with another sham organization owned by McKnight—CGAM—which would pay HWIT monthly returns of 100 percent. Doc. 1 at 23. The HWIT investors, however, never saw these secondary agreements. Doc. 1 at 23.

- Over the course of 14 weeks between April and August 2018, the F&M Defendants accepted four wires totaling $2.045 million from HWIT Investors into their firm accounts. Doc. 1 at 23, 26. They accepted an initial $200,000 deposit into F&M's operating account from HWIT Investor 1. Doc. 1 at 23, 26. Next, the F&M Defendants accepted a $345,000 deposit into F&M's operating account from Investor 2, of which they transferred $140,000 back to HWIT Investor 1. Doc. 1 at 23, 26. This payment induced HWIT Investor 1 to make a subsequent $500,000 investment, which the F&M Defendants received in their operating account. Doc. 1 at 23, 26. Lastly, they received a $1 million deposit from HWIT Investor 3 into the firm's IOLTA account from which they transferred $140,000 back to HWIT Investor 1. Doc. 1 at 23, 26. Almost immediately upon the receipt of the investors' funds, the F&M Defendants transferred the money directly to McKnight and others as McKnight instructed. Doc. 1 at 26. The only exception was $76,000 which the F&M Defendants took for themselves, also at McKnight's direction. Doc. 1 at 25-26.

- F&M willingly, and without question, received these third-party funds and promptly distributed them, even though F&M had never seen these or any investment agreements underlying the transactions, never done any legal work related to these transactions, and never attempted to learn the identity of the parties sending their firm funds or their intent for the use of their funds. Doc. 1 at 25-26. They did, however, have an understanding that McKnight preferred to involve law firms in his deals because he believed investors were more comfortable sending their money to a reputable law firm than directly to McKnight. Doc. 1 at 25.

- Miller and his sole partner at F&M were familiar with McKnight. Doc. 1 at 24. The F&M Defendants had represented McKnight in various matters, including a lawsuit and a number of failed transactions. Doc. 1 at 24. They also knew that McKnight had served jail time for a drug-related offense. Doc. 1 at 24. By April 2018, McKnight owed F&M approximately $150,000 in overdue legal bills. Doc. 1 at 24.

- Instead of performing any degree of diligence, Miller, who controlled F&M's bank accounts, "blindly followed McKnight's instructions" thereby abdicating control over the firms' bank accounts to McKnight and knowingly or recklessly facilitating transactions that furthered McKnight's fraud. Doc. 1 at 24, 26. The F&M Defendants "also misappropriated investor funds when they retained $76,000 in HWIT Investors' funds solely at McKnight's instruction." Doc. 1 at 26.

- The F&M Defendants encountered and ignored multiple red flags regarding these banking transactions, including failing to question "why a client they had never known to successfully complete a transaction, who owed them more than $150,000 in overdue legal fees, and who they knew had a past history of incarceration for drug charges would suddenly have over $2 million at his personal disposal." Doc. 1 at 29. In addition, they did not inquire why none of the wire confirmations made any reference to McKnight or CGE or otherwise indicated that the funds belonged to McKnight. Doc. 1 at 29. Each wire confirmation contained a similar transaction code starting with "HWIT", but Miller did not know anything about HWIT, and he did not ask McKnight or the investors what it was. Doc. 1 at 29. F&M made payments to the first HWIT investor out of the deposits made by the second and third HWIT investors. While the name of the account making the first HWIT deposit and the account receiving the two payments were not identical, they were very similar, and were the F&M Defendants to have "exercised basic due diligence, they would have learned that McKnight was using HWIT Investor 2's and 3's money to make payments to HWIT Investor 1—*i.e.*, F&M was facilitating Ponzi payments." Doc. 1 at 29. In addition, Miller sent money twice to an entity named "Boiler Room Holdings," which he conceded was a bad name for an investment company.[2] Doc. 1 at 29.

- The F&M Defendants "ignored a myriad of red flags and recklessly followed McKnight's instructions to disburse over $2 million in investor funds, including to themselves, despite recognizing that the investors were taking comfort in the fact that they had sent their money to a law firm rather than to McKnight directly," which gave McKnight's scheme an air of legitimacy. Doc. 1 at 30.

For the F&M Defendants' alleged roles in the HYIP Scheme, the SEC brings the following claims:

Claim Five for aiding and abetting McKnight's violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), as set forth in Claim One; and

Claim Six for aiding and abetting McKnight's violations of the Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as set forth in Claim Two.

Doc. 1 at 4-5, 40-41, 43-44. The SEC seeks disgorgement of ill-gotten gains from the F&M Defendants and the imposition of civil monetary penalties, as well as an officer-director bar on Miller. Doc. 1 at 6, 46-47.

_____

[2] The court takes judicial notice pursuant to Federal Rule of Evidence 201 that one meaning of a boiler room is "a room equipped with telephones used for making high-pressure usually fraudulent sales pitches." "Boiler room," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/boiler%20room (last visited Oct. 1, 2023).

The F&M Defendants seek dismissal of the complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  *See* Doc. 22.  The motion to dismiss has been fully briefed and is ripe for disposition.

## II. APPLICABLE LAW

### A. Rule 12(b)(6)

A plaintiff fails to state a claim for relief under Rule 12(b)(6) when the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To overcome a Rule 12(b)(6) motion, a plaintiff's "complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (quotation omitted).  In ruling on a motion to dismiss, a court must accept all factual allegations in the complaint as true. *Twombly*, 550 U.S. at 572.  Nevertheless, a complaint should not simply contain conclusory allegations, but must be pled with a certain level of factual specificity, and the district court cannot "accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citation and quotation omitted).

### B. Rule 9(b)

Because the SEC alleges securities fraud, the complaint also must satisfy Federal Rule of Civil Procedure 9(b), which requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).  The particularity demanded by Rule 9(b) necessarily differs with the facts of each case. *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067-68 (5th Cir. 1994).  Importantly, though, "the second sentence of Rule 9(b) relaxes the

particularity requirement for conditions of the mind, such as scienter: 'Malice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *Tuchman*, 14 F.3d at 1068 (quoting FED. R. CIV. P. 9(b)).

## III. ANALYSIS

Section 20(e) of the Exchange Act permits the SEC to bring an aiding-and-abetting action against "any person that knowingly or recklessly provides substantial assistance" to a primary violator of the securities laws. 15 U.S.C. § 78t(e). In 2010, Congress amended the language of Section 20(e) of the Exchange Act by passing the Dodd-Frank Wall Street Reform and Consumer Protection Act "to add the words 'or recklessly' after 'knowingly'" to satisfy the scienter requirement in aiding-and-abetting cases. *S.E.C. v. Life Partners Holdings, Inc.*, 854 F.3d 765, 778 (5th Cir. 2017) (citing Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (codified at 15 U.S.C. § 78t(e)).[3]

"The amendment to Section 20(e) was intended to correct the holding of a growing number of courts 'that knowingly means actual knowledge, rather than recklessness.'" *S.E.C. v. Blackburn*, 156 F. Supp. 3d 778, 795 (E.D. La. 2015) (quoting *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 801 (11th Cir. 2015) (in turn quoting H.R. Rep. No. 111-687(I), at 80 (2010))). The amendment clarifies that "recklessness is sufficient for bringing an aiding and abetting action." *Id.* (citation omitted).

---

[3] In *Life Partners Holdings*, given that many of the alleged acts took place prior to 2010, the jury was instructed on the version of Section 20(e) of the Exchange Act prior to Dodd-Frank. *See Life Partners Holdings*, 854 F.3d at 778 n.8.

Following the amendment to Section 20(e), to establish aiding-and-abetting liability, the SEC must show that (1) the primary party committed a securities violation; (2) the aider and abettor had "general awareness" of its role in the violation; and (3) the aider and abettor knowingly or recklessly rendered "substantial assistance" in furtherance thereof.  *Id.* at 794 (citation omitted).  "Although the SEC may satisfy the second and third elements by showing conscious intent, the SEC is only required to show recklessness."  *Id.* (citing 15 U.S.C. § 78t(e)).

In their motion to dismiss, the F&M Defendants assume that the SEC has adequately alleged the first element, *i.e.*, that McKnight committed an underlying securities violation. Doc. 22 at 14.  However, they challenge the second and third elements of the three-part test, contending that the complaint does not plausibly allege that they (1) had knowledge of McKnight's violation or (2) offered "substantial assistance to McKnight to further his scheme." Doc. 22 at 14.

In response, the SEC contends that the F&M Defendants' motion to dismiss "applies an outdated and incorrect standard that would require the SEC to allege that the F&M Defendants had actual knowledge of the underlying violation and were effectively active participants in the scheme itself." Doc. 31 at 7.  According to the SEC, "[a]pplying the correct recklessness standard to the second and third prongs of the three[-]part test, [it] has more than adequately alleged sufficient facts to satisfy them." Doc. 31 at 14.  Upon a careful reading of the F&M Defendants' motion to dismiss and reply, the Court finds that they do not contest that the SEC may satisfy the second and third elements of an aiding-and-abetting claim by showing recklessness and not actual knowledge.  *See* Doc. 22 at 13-18; Doc. 37 at 2-3.

### A. General Awareness

The F&M Defendants argue that the Complaint relies on "conclusory" allegations and fails to establish their "general awareness" of their participation in an improper activity, as required to satisfy the second prong of the three-prong test for aider-and-abettor liability. Doc. 22 at 14-18. The F&M Defendants further assert that the SEC fails to allege they were aware of any securities law violation or fraudulent scheme and, as such, they could not possibly have had "any awareness whatsoever, that McKnight was perpetrating a fraud." Doc. 22 at 15.

To satisfy the second element of an aiding-and-abetting violation, the SEC must adequately allege the F&M Defendants had a "general awareness that [their] role was part of an overall activity that is improper." *Woodward v. Metro Bank*, 522 F.2d 84, 95 (5th Cir. 1975)[4]; *see also S.E.C. v. Stack*, No. 1:21-CV-00051-LY, 2021 WL 4777588, at *7 (W.D. Tex. Oct. 13, 2021) ("An aider and abettor need have only a 'general awareness' that one's role was part of an overall activity that is improper.") (citation omitted). Allegations that an aider or abettor "encountered 'red flags' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violators" may demonstrate "severe" or "extreme" recklessness. *S.E.C. v. Morris*, No. H-04-3096, 2005 WL 2000665, at *9 (S.D. Tex. Aug. 18, 2005); *see also S.E.C. v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 784-85 (N.D. Ill. 2016) (Recklessness can be found where an aider and abettor should be alerted by "red flags" that signify that the primary violator has violated the securities laws.).

---

[4] As the SEC correctly notes, the *Woodward* decision includes a now statutorily abrogated narrower view of scienter in an aiding-and-abetting securities fraud claim. *See* Doc. 31 at 16 n. 6 (citing *Woodward*, 522 F.2d at 95-96). Its articulation as to the standard for "general awareness," however, remains good law and both parties rely upon *Woodward* for this standard, as do other courts. Doc. 22 at 14; Doc. 31 at 16; *see, e.g.*, *S.E.C. v. Stack*, No. 1:21-CV-00051-LY, 2021 WL 4777588, at *7 (W.D. Tex. Oct. 13, 2021) (citing *Woodward*, 522 F.2d at 94-95, for its "general awareness" standard).

Although the F&M Defendants acknowledge that "general awareness" can be shown by "red flags" that are "suspicious events creating reasons for doubt," *see* Doc. 22 at 16, they contend that the "red flags identified by the SEC highlight the baselessness of its claims against the F&M Defendants." Doc. 22 at 16 (footnote omitted).

Having considered the allegations in the Complaint, the legal briefing, and applicable law, the Court concludes that the SEC has sufficiently pled facts which demonstrate, or which it can be inferred, that the F&M Defendants had a "general awareness" that their role was part of an overall activity that was improper. The F&M Defendants mistakenly argue that the Complaint is insufficient because it alleges the F&M Defendants were not aware of any wrongdoing by McKnight; however, the SEC actually alleges that their fault was in *not* being aware. In sum, the Complaint adequately alleges the F&M Defendants acted with, at minimum, extreme recklessness by assuming, without confirming, that the transactions associated with the HYIP Scheme were legitimate despite numerous "red flags" indicating they were not, including: (1) McKnight, a client with drug-related convictions, had not paid approximately $150,000 in legal bills but suddenly informed Miller that investors would be wiring over $2 million in funds to the firm's escrow account; (2) the F&M Defendants knew nothing about the investors or what they expected F&M to do with these funds; (3) the F&M Defendants knew they were handling investor funds unrelated to any underlying legal work as they provided no legal services related to the investments; (4) the F&M Defendants did not review or even possess the transaction documents related to the investments; and (5) the F&M Defendants knew McKnight preferred to involve law firms in his financial deals because he believed investors were more comfortable sending their money to a reputable law firm than directly to McKnight. Doc. 1 at 24, 26, 29-30.

Further, the Complaint alleges the F&M Defendants encountered "red flags" related to the transactions themselves, including that (1) none of the wire confirmations referred to McKnight or otherwise indicated that the funds belonged to him; (2) although each wire confirmation contained a similar transaction code starting with "HWIT," Miller knew nothing about HWIT and did not ask McKnight or the investors what it was; (3) F&M made payments to HWIT Investor 1 out of the deposits made by HWIT Investors 2 and 3; and (4) the F&M Defendants followed McKnight's instructions to keep $76,000 of the HWIT Investors' funds as payment for his unrelated legal without inquiring whether investors knew McKnight had directed the use of their funds in this way.  Doc. 1 at 25-26, 29.

The Complaint alleges that had the F&M Defendants exercised basic due diligence as attorneys, they would have learned that McKnight was using HWIT Investor 2's and 3's money to make payments to HWIT Investor 1, and that they were facilitating Ponzi payments.  Doc. 1 at 29.

The Court concludes that these allegations are sufficient to create an inference that the F&M Defendants had a "general awareness" that their "role was part of an overall activity that [was] improper."  Woodward, 522 F.2d at 95.  The Complaint sufficiently alleges that the F&M Defendants acted with, at minimum, extreme recklessness by assuming—without confirming or attempting to exercise even a modicum of lawyerly interest in the implications of their actions— that the wire transfers were legitimate transactions despite numerous "red flags" and suspicious circumstances indicating they were not.  As such, the Court finds that the SEC's allegations are sufficient to satisfy the "general awareness" element for purposes of both Rules 9(b) and 12(b)(6).

10

### B. Substantial Assistance

The F&M Defendants argue that the complaint fails to adequately allege that they provided "substantial assistance" in the fraudulent scheme for reasons similar to those they argued with respect to the "general awareness" element.  Specifically, the F&M Defendants contend that the funds from the wire transfers at issue "wound up" in F&M's operating account solely because of HWIT's and McKnight's fraudulent conduct and the lies McKnight told Miller regarding the funds, not any act attributable to them. Doc. 22 at 19.  As such, they contend they could not possibly have rendered substantial assistance in furtherance of McKnight's unlawful scheme. Doc. 22 at 19.

To meet the substantial assistance requirement, "the SEC must allege facts showing that Defendants' conduct was a substantial causal factor in the perpetration of the primary party's fraud." *S.E.C. v. Shapiro*, No. 4:05-CV-364, 2008 WL 819945, at *7 (E.D. Tex. Mar. 25, 2008) (citation omitted).  To do this, "the SEC must demonstrate that the defendant 'in some sort associated himself with the venture, that he participated in it as something that he wished to bring about, and that he sought by his action to make it succeed.'" *S.E.C. v. Felton*, No. 3:20-CV-0822-G, 2021 WL 2376722, at *12 (N.D. Tex. June 10, 2021) (Fish, J.) (quoting *S.E.C. v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (cleaned up)).  The SEC must further allege that "the aider and abettor knowingly or *recklessly* rendered 'substantial assistance' in furtherance of" securities violations. *Blackburn*, 156 F. Supp. 3d at 794 (emphasis in original) (citation omitted); *see also Stack*, 2021 WL 4777588, at *8 (finding that an attorney who had "no idea what is ever being done" and stood "as a buffer" between the primary violator and the market had "knowingly or recklessly provided substantial assistance" in the primary violation by, among

other things, controlling accounts to which investors sent money, wiring investor funds to the primary violator, and misappropriating investor funds).

As already noted, the Complaint alleges that the F&M Defendants (1) assisted McKnight's fraud by transferring the HWIT investors' money to McKnight; (2) executed at least three Ponzi payments to prop up the scheme, which induced at least one investor to invest further; and (3) allowed their firm to be used to lend credibility to the scheme. Doc. 1 at 26-30. The Court finds that, taken as true, these allegations are sufficient under Rules 9(b) and 12(b)(6) to support the SEC's claim that the F&M Defendants knowingly or recklessly provided substantial assistance to McKnight in the commission of the primary violation.

## IV. CONCLUSION

For the reasons set forth above, *Defendants Frost & Miller, LLP and Kenneth Miller's Motion to Dismiss the Securities and Exchange Commission's Complaint*, Doc. 22, should be **DENIED.**

**SO RECOMMENDED** on October 17, 2023.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

12

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of this report and recommendation will be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  An objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and indicate the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).

13