## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

_____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § <br> § <br> § |
| Plaintiff, | § |
| v. | § <br> § |
| AARON CAIN MCKNIGHT; BMP GLOBAL INVESTMENTS, LLC; BPM ASSET MANAGEMENT, LLC; SHERRY REBEKKA SIMS; KENNETH MILLER; FROST & MILLER, LLP; and HARMONY BROOK MCKNIGHT, | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |
| Defendants, | § <br> § <br> § |
| -and- | § <br> § |
| ACCELERATED VENTURE PARTNERS, LLC and TIMOTHY NEHER, | § <br> § <br> § <br> § |
| Relief Defendants. | § <br> § |

Case No. 3:23-cv-00641-L

## FROST & MILLER, LLP AND KENNETH MILLER'S OBJECTIONS TO FINDINGS, CONCLUSIONS, AND RECOMMENDATION ON MOTION TO DISMISS

Jeffrey J. Ansley
State Bar No. 00790235
jansley@vedderprice.com
Samuel M. Deau
State Bar No. 24135506
sdeau@vedderprice.com
Katie A. Lee (pro hac vice forthcoming)
Illinois Bar No. 6337232
Klee@vedderprice.com
**VEDDER PRICE P.C.**
300 Crescent Court, Suite 400
Dallas, Texas 75201
469.895.4790

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................................. 1

II.  SUMMARY AND BACKGROUND ...................................................................... 2

    A.  McKnight's Alleged Fraud ............................................................................. 2

    B.  The F&M Defendants ...................................................................................... 4

III.  ARGUMENT ........................................................................................................ 6

    A.  Standard of Review ......................................................................................... 6

    B.  The Report Applies the Wrong Standard ........................................................ 7

    C.  The Report Erroneously Deems the "Red Flags" Cited by the SEC to Be
        Sufficient for Aiding and Abetting Liability .................................................. 10

    D.  The Report Erroneously Concludes that the SEC's Allegations Are
        Sufficient for Showing the "Substantial Assistance" Required for Aiding
        and Abetting Liability ..................................................................................... 15

IV.  CONCLUSION AND REQUEST FOR ARGUMENT ............................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Howard v. SEC*,
    376 F.3d 1136 (D.C. Cir. 2004)............................................................ 9

*Ilegbodu v. Specialized Loan Servicing, LLC*,
    No. 3:17-CV-701-L, 2018 WL 993841 (N.D. Tex. Feb. 21, 2018)........................................ 6

*Nelson v. Astrue*,
    No. 3:12-818-L, 2013 WL 628567 (N.D. Tex. Feb. 20, 2013)............................................. 6

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012) ............................................................ 15

*SEC v. Arbitrade Ltd.*,
    No. 22-cv-23171-BLOOM, 2023 WL 2785015 (S.D. Fla. Apr. 5, 2023) ........................... 10

*SEC v. Carrillo Huettel LLP*,
    No. 13 Civ. 1735 (GBD), 2017 WL 213067 ...................................................... 17

*SEC v. Felton*,
    No. 3:20-cv-0822-G, 2021 WL 2376722 (N.D. Tex. June 10, 2021) ................................. 16

*SEC v. Jackson*,
    908 F. Supp. 2d 834 (S.D. Tex. 2012)................................................................. 17

*SEC v. Milan Grp. Inc.*,
    962 F. Supp. 2d 182 (D.D.C. 2013) (vacated in part on other grounds) ............................. 17

*SEC v. Montgomery*,
    No. SA-20-CA-598-FB, 2021 WL 210749 (W.D. Tex. Jan. 20, 2021) ............................. 17

*SEC v. Morris*,
    No. H-04-3096, 2005 WL 2000665 (S.D. Tex. Aug. 18, 2005)....................................*passim*

*SEC v. Mudd*,
    885 F. Supp. 2d 654 (S.D.N.Y. 2012) .............................................................. 15

*SEC v. Nutmeg Grp., LLC*,
    162 F. Supp. 3d 754 (N.D. Ill. 2016).......................................................... 9, 11

*SEC v. Stack*,
    No. 1:21-cv-0051-LY, 2021 WL 4777588 (W.D. Tex. Oct. 13, 2021)............................... 15

*United States v. USPlabs, LLC*,
    338 F. Supp. 3d 547 (N.D. Tex. 2018) ................................................................. 6

*United States v. USPlabs, LLC*,
    No. 3:15-CR-496-L, 2019 WL 499101 (N.D. Tex. Feb. 8, 2019) ......................... 6

*Woodward v. Metro Bank*,
    522 F.2d 84 (5th Cir. 1975) ................................................................................... 9

**Other Authorities**

Fed. R. Civ. P. 9(b) .................................................................................................... 6

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 6

Fed. R. Civ. P. 27(b)(3) .............................................................................................. 6

## I.   **PRELIMINARY STATEMENT**

The Magistrate Judge's Findings, Conclusions, and Recommendation on Frost & Miller, LLP ("F&M") and Kenneth Miller's ("Mr. Miller") (collectively, the "F&M Defendants") Motion to Dismiss the Securities and Exchange Commission's Complaint (hereinafter, the "Report"),[1] omits or disregards several critical facts. The Report also cites incorrect legal standards to arrive at the flawed holding that the SEC's Complaint (the "Complaint") sufficiently states a claim of aiding and abetting fraud against the F&M Defendants. It does not.

The Report mistakenly concludes that the F&M Defendants had "general awareness" of Aaron Cain McKnight's ("McKnight") fraudulent scheme because they failed to conduct any "due diligence" about his investors and the underlying transactions. This conclusion is fatally flawed. The real alleged perpetrator in this case, McKnight, lied to Mr. Miller when he conducted due diligence to determine the purpose the funds in question were being used for. The SEC admits the fact that Mr. Miller attempted to conduct due diligence, but that McKnight lied to him. *See* Compl. ¶ 85. Yet, the Report leaves this essential fact out—which defeats the Report's rationale. This omission exposes the Report's flaws.

Rather than analyzing the numerous facts in the SEC's Complaint that completely contradict the SEC's theory of its case against the F&M Defendants, the Report incorrectly accepts the SEC's conclusory, contradictory, and speculative allegations as sufficient to state a claim for aiding and abetting *fraud* liability against the F&M Defendants. Significantly, the Report cherry-picks paragraphs to rely on and does not address the SEC's significant admissions and contradictions. *Id.* at ¶¶ 85 and 86. The SEC admits in the Complaint that the F&M Defendants

---

[1] The Report is ECF No. 39. The F&M Defendants' Motion to Dismiss is ECF No. 22, their Reply is ECF No. 37.

**DEFENDANTS FROST & MILLER, LLP AND KENNETH MILLER'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON THEIR MOTION TO DISMISS– PAGE 1**

had no knowledge nor participation in the transactions, facts that the Report does not acknowledge. *Id.*

Further, in many places, the Report relies on the incorrect legal standard used to analyze aiding and abetting fraud liability. The Report seeks to create new law and it further seeks to hold that certain "red flags" are sufficient to establish the requisite aiding and abetting fraud liability, despite no Court ever doing so with these sorts of illusory "red flags."

The Complaint lodges serious allegations against the F&M Defendants—allegations that threaten to eradicate the highly respected personal and professional reputations that the F&M Defendants have spent a lifetime building. The SEC should not be allowed to proceed with pursuing these claims against the F&M Defendants without being required to present the Court with the *facts* underlying its allegations. Here, the SEC has not and cannot do so. The F&M Defendants therefore respectfully request that the Court reject the findings in the Report in their entirety, grant their motion to dismiss, and dismiss the SEC's Complaint with prejudice.

## II.   SUMMARY AND BACKGROUND

While the complete factual underpinnings of this case are outlined in the F&M Defendants' motion to dismiss, the relevant factual background is repeated herein.

### A.   McKnight's Alleged Fraud

The SEC alleges that McKnight concocted and executed three separate, distinct schemes. Compl. ¶¶ 2, 4, 5. The Complaint only alleges that the F&M Defendants aided and abetted McKnight in one scheme, identified as the "high-yield investment trading program" scheme ("HYIP Scheme"). McKnight posed as an investment professional running several investment entities collectively called the "CGE Group."[2] Compl. ¶¶ 2, 33. According to the SEC, McKnight

---

[2] The Complaint alleges multiple different schemes spanning from March 2018 to September 2021, including the "HYIP Scheme," the "RIA Scheme" and the "PPE Scheme." Compl. ¶¶ 2, 4, 5. This motion focuses on the HYIP

ran the HYIP Scheme from March 2018 to April 2019, with investors committing their principal investment for a number of months on the promise that they would be paid monthly returns ranging from 40 to 100 percent of their initial investment each month for ten to twelve months. *Id.* ¶ 32. The SEC alleges that McKnight promised his investors that their first payment would arrive within 30 days of their deposit. *Id.*

McKnight allegedly represented that these returns would be generated by his "trading program." *Id.* He also recruited two other individuals with no financial industry experience to solicit investors for his scheme. *Id.* ¶ 33. These individuals are Defendant Sherry Rebekka Sims ("Sims") and Promoter A, the principal of Heaven's Way Investment Trust ("HWIT"). *Id.* ¶ 27. Importantly, the Complaint does not allege that the F&M Defendants had any involvement with Sims or her alleged investors.[3] The SEC's allegations are focused on the F&M Defendants' unsolicited receipt of four wire transfer deposits from three HWIT investors which Promoter A caused to be made into the F&M Defendants' bank accounts between April and August 2018. *Id.* at ¶ 90. McKnight, a longstanding client of F&M, after falsely advising the F&M Defendants that the funds were under his sole custody and control, then directed them to disburse the funds. *Id.* at ¶ 85. There are no allegations that the F&M Defendants knew Promoter A. They did not.

McKnight and Promoter A convinced three investors to enter into four agreements with HWIT, which stated that the investors agreed to allow HWIT to negotiate and structure various financial transactions that would yield a monthly return of 20-70% of their investment. *Id.* ¶¶ 75-76. Pursuant to the agreements, Promoter A, who controlled HWIT, instructed and caused HWIT's

---

Scheme, since that is the scheme that the SEC alleges the F&M Defendants aided and abetted. Additional facts regarding the RIA Scheme and PPE Scheme are outlined in the Complaint, but the F&M Defendants are not allegedly involved in those schemes.

[3] Of the 16 HYIP investors referenced in the Complaint, only three HWIT investors are relevant to the transactions that the SEC alleges the F&M Defendants aided and abetted. Compl. at ¶ 128. The other 13 investors were brought into the alleged scheme by Sims—who the SEC does not allege that the F&M Defendants had any involvement with.

investors to deposit "their investment money 'into an Escrow Account with escrow agent Frost & Miller, LLP.'" *Id.* ¶¶ 28, 77, 78. The four resulting wire transfers are the subject of the SEC's claims against the F&M Defendants. *Id.* ¶¶ 28, 90. The agreements also stated that HWIT would arrange and pay for surety bonds issued by Subgallagher Investment Trust ("SGIT") of which Simas was the principal guaranteeing performance of the agreements and protecting the funds invested from "theft and/or fraud" while they were in the possession of HWIT and F&M. *Id.* ¶¶ 29, 77. HWIT would then enter into secondary agreements with another sham organization owned by McKnight, CGAM, which would pay HWIT monthly returns of 100% per month. *Id.* ¶ 78. The HWIT investors never saw these secondary agreements. *Id.* Significantly, the Complaint does not allege that at the times the funds were invested there were any communications between the F&M Defendants and the three HWIT investors because there were none.

### B.   The F&M Defendants

F&M is a law firm with two attorneys—Kenneth Miller and Gregory Frost. Compl. ¶ 19. Miller is a member of the New York state bar and has been practicing law for more than 46 years. *Id*. ¶ 18. The F&M Defendants represented McKnight as a client over multiple engagements spanning several years, representing him in both litigation and transactional matters. *Id.* ¶ 84. McKnight had not yet paid all of his outstanding legal fees owed to F&M at the time he was perpetrating the alleged scheme described in the Complaint. *Id.* ¶ 84.

As part of his scheme, and to create the false impression that he did not control investor funds, McKnight instructed some investors to deposit their investment funds into an attorney escrow account through F&M. *Id.* ¶ 41. McKnight did this despite having no agreed arrangement with F&M to escrow the funds and without disclosing this arrangement to F&M. *Id.* ¶ 41. Unbeknownst to the F&M Defendants and as part of his scheme, McKnight utilized F&M's name

in connection with his solicitation of the HWIT investors. *Id.* ¶ 86. The F&M Defendants were unaware that McKnight's agreements with the HWIT investors provided for the investors to deposit their money into an escrow account with F&M, after which HWIT would use the investor funds to purchase surety bonds to "protect the investments." *Id.* ¶ 77. The agreements identified the account number for F&M's operating account, not the account number for the IOLA (escrow) account. *Id.* ¶ 86.

The F&M Defendants are not alleged to have played any role in the HWIT transactions giving rise to the investments solicited by McKnight. *Id.* They did not know about McKnight's alleged scheme. *Id.* They did not have communications with McKnight's HWIT investors. *Id.* ¶ 87. They did not see any of the underlying agreements between HWIT and its investors. *Id.*

In April 2018, McKnight informed F&M that money would be wired into F&M's escrow accounts, that it would remain under McKnight's control and discretion, and that he would provide instructions for the disposition of that money. *Id.* ¶ 85. However, he lied to Mr. Miller about this, telling him there was no escrow arrangement affecting the funds and that McKnight had the sole authority to direct the disbursement of the funds. *Id.* McKnight directed Mr. Miller that some of the money would be used to pay legal fees still owed to F&M. *Id.* ¶ 87.

F&M followed McKnight's instructions regarding disposition of the funds that he represented were under McKnight's sole, discretionary control. *Id.* ¶¶ 88–90. The four transactions at issue occurred over a four-month period in 2018.[4] *Id.* ¶ 90. When his scheme began to unravel, McKnight sought to deflect attention for misappropriating investor assets by telling his investors that the F&M Defendants were at fault for the loss of their investments. *Id.* ¶ 73.

---

[4] The Complaint does not allege that F&M's handling of these transactions was outside the scope of F&M's ordinary course of business.

**DEFENDANTS FROST & MILLER, LLP AND KENNETH MILLER'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON THEIR MOTION TO DISMISS– PAGE 5**

The F&M Defendants moved to dismiss the Complaint on the grounds that the SEC failed to state a claim for which relief can be granted under Federal Rules of Civil Procedure 12(b)(6) and 9(b). Specifically, the F&M Defendants argued that allegations in the Complaint, even when accepted as true, fail to plausibly allege that the F&M Defendants had a general awareness that they were participating in McKnight's scheme, nor did the F&M Defendants render the "substantial assistance" required to state a claim for aiding and abetting liability. On October 17, 2023, Magistrate Judge Renee Harris Toliver issued the Report, rejecting the F&M Defendants' arguments in their entirety and recommending that their Motion to Dismiss be denied.

## III.   ARGUMENT

### A.   Standard of Review

When reviewing a magistrate's report and recommendation on a dispositive motion, the district court applies a de novo standard of review. *See, e.g.*, *Nelson v. Astrue*, No. 3:12-818-L, 2013 WL 628567, at *1 (N.D. Tex. Feb. 20, 2013) (Lindsay, J.). Upon review, the district court may accept, reject, or modify the recommended decision; receive additional evidence; or return the matter to the magistrate with additional instructions. *Id.* (quoting Fed. R. Civ. P. 27(b)(3)). The court will sustain objections to reports and recommendations where it finds that the magistrate judge made an error of law or fact. *See, e.g.*, *Ilegbodu v. Specialized Loan Servicing, LLC*, No. 3:17-CV-701-L, 2018 WL 993841, at *1 (N.D. Tex. Feb. 21, 2018) (Lindsay, J.) (rejecting Judge Toliver's report and recommendation recommending that motion to dismiss be granted because, in part, Judge Toliver relied on cases that were factually or legally distinguishable from the case at hand); *see also, e.g.*, *United States v. USPlabs, LLC*, No. 3:15-CR-496-L, 2019 WL 499101, at *12 (N.D. Tex. Feb. 8, 2019) (Lindsay, J.) (sustaining objection to Judge Toliver's report, which was "contrary to law"); *United States v. USPlabs, LLC*, 338 F. Supp. 3d 547, 563 (N.D. Tex. 2018)

(Lindsay, J.) (sustaining objection to Judge Toliver's report to the extent it required the Government to provide additional factual support in the indictment at issue).

### B.   The Report Applies the Wrong Standard.

In multiple instances, the Report characterizes the F&M Defendants' conduct as showing "extreme recklessness," concluding that such "extreme recklessness" satisfies the "general awareness" prong of aiding and abetting liability. *See* Report at 8, 9, 10. However, "extreme recklessness" is not the standard, nor does the Complaint sufficiently allege that the F&M Defendants had the "general awareness" required for liability. The Report fails to account for the SEC's contradictory admissions that the F&M Defendants had no knowledge of the four transactions and did not participate in them. Compl. ¶ 86.

The Report cites *SEC v. Morris*, No. H-04-3096, 2005 WL 2000665, at *9 (S.D. Tex. Aug. 18, 2005), for the proposition that "[a]llegations that an aider or abettor 'encountered "red flags" or "suspicious events creating reasons for doubt" that should have alerted him to the improper conduct of the primary violators' may demonstrate 'severe' or 'extreme' recklessness." But *Morris* is a pre-Dodd-Frank case, and "extreme" or "severe" recklessness is not the standard, nor is it what the SEC alleges the F&M Defendants exhibited. Although the Report recommends accepting the SEC's speculative allegation that had the F&M Defendants "exercised basic due diligence, they would have learned that McKnight was using HWIT Investor 2's and 3's money to make payments to HWIT Investor 1," Report at 4, Compl. ¶ 91, the Report completely ignores the multiple allegations that contradict the SEC's conclusion. First, the SEC alleges that the F&M Defendants were familiar with McKnight because he had been a long-time client. *See* Compl. ¶ 84. Attorneys are allowed to reasonably rely on information provided to them by their clients—and in this case, as the SEC alleges, Mr. Miller fell victim to McKnight by relying on McKnight's

misrepresentations about the incoming wire funds when he conducted due diligence. *Id*. ¶ 85. Critically, while the SEC alleges the number of things that the F&M Defendants did not know— including "the circumstances under which investors were sending funds," "whether the firm's name was used in soliciting these investments," or "what the investors expected F&M to do with these funds"—the SEC does ***not*** allege that the F&M Defendants did not ***ask*** McKnight. *Id*. ¶ 86. This is a distinction with a difference, especially when considering the fact that the SEC admits that McKnight lied to the F&M Defendants. *Id.* So, the Report incorrectly concludes that the F&M Defendants did not seek to confirm details regarding the transactions. Report at 9. The F&M Defendants did, but they were lied to. Compl. ¶ 85.

Further, while the Report concludes that the Complaint "alleges that had the F&M Defendants exercised basic due diligence as attorneys, they would have learned that McKnight was using HWIT Investor 2's and 3's money to make payments to HWIT Investor 1, and that they were facilitating Ponzi payments," Report at 10, the Magistrate Judge ignores the SEC's allegations in Paragraph 91 of the Complaint. There, the SEC alleges that "the name of the account making the first HWIT deposit and the account receiving the two payments were not identical," but they "were similar." Compl. ¶ 91. The SEC does not allege how any degree of "due diligence" would have led any reasonable person to conclude that "McKnight was using HWIT Investor 2's and 3's money to make payments to HWIT Investor 1" when the account numbers did not even match. Nor does the SEC allege, or the Report explain, how failure to come to this conclusion amounts to recklessness, or a "general awareness" that the F&M Defendants were playing a role in an improper activity. *See* Report at 10.

Even assuming that *Morris* cites the correct standard, the case is yet another example of why the F&M Defendants' actions, even if accepted as true, were not "reckless" and do not

adequately show that the F&M Defendants had any general awareness of wrongdoing. In *Morris*, as the F&M Defendants thoroughly outlined in their Motion to Dismiss and Reply in Support (ECF Nos. 22 and 37), the court held that the defendant did not ignore any obvious red flags or suspicious events where the defendant reviewed and signed public filings that were substantially misleading. 2005 WL 2000665, at *9-10. In that case, the defendant was a licensed CPA who ignored obvious signs of accounting errors. *Id.* at *1-2. That level of awareness or recklessness simply is not alleged here.

The Report also cites *SEC v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754 (N.D. Ill. 2016), a post-Dodd case, but that case held that while "general awareness" is required for aiding and abetting liability, that requirement means that the defendant must have "knowledge or awareness of the conduct's impropriety or illegality," not just knowledge of the conduct. *See* Report at 8. Indeed, the *Nutmeg* court noted (and the Report failed to mention) that "[e]ven in circuits where recklessness suffices to establish the second element, that bar remains high." *Nutmeg*, 162 F. Supp. 3d at 783. The *Nutmeg* court even cited the "extreme recklessness" standard and concluded that "even under a recklessness standard, this type of 'should have known' argument is not sufficient to establish aiding and abetting liability." *Id.* at 784-85 (citing *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004)). But here, it is precisely this "should have known" argument that the Report concludes saves the day when it states, "the F&M Defendants mistakenly argue that the Complaint is insufficient because it alleges the F&M Defendants were not aware of any wrongdoing . . . [but] the SEC actually alleges that their fault was in *not* being aware." Report at 9. Unawareness is not the standard—general awareness is. *See, e.g.*, *Woodward v. Metro Bank*, 522 F.2d 84, 95 (5th Cir. 1975); *see also* Report at 8, n. 4 ("As the SEC correctly notes, the *Woodward* decision includes a now statutorily abrogated narrower view of scienter in an aiding-and-abetting securities fraud

claim . . . Its articulation as to the standard for 'general awareness,' however, remains good law and both parties rely upon *Woodward* for this standard, as do other courts."). Ultimately, in *Nutmeg*, the court held that the SEC's "undeveloped arguments about failure to stop and nondisclosure therefore would not compel a reasonable jury to find that Randall and David acted with knowledge or general awareness (even if the latter included recklessness)." *Nutmeg*, 162 F. Supp. 3d at 784. Here, too, the Complaint does not allege facts that show that the F&M Defendants had a "general awareness" that they were participating in McKnight's scheme. Instead, the Complaint alleges the opposite—the F&M Defendants had no knowledge of the transactions and did not participate in them. Compl. ¶¶ 85, 86.

> ### C.   <u>The Report Erroneously Deems the "Red Flags" Cited by the SEC to Be Sufficient for Aiding and Abetting Liability.</u>

The Report also summarily adopts the SEC's "red flag" theory of liability without adequately analyzing the conduct at issue in cases where "red flag" liability has been found. In those cases, which the F&M Defendants thoroughly discuss in their motion to dismiss and reply in support, the conduct at issue was significantly more egregious than the conduct alleged here. *See, e.g., SEC v. Arbitrade Ltd.*, No. 22-cv-23171-BLOOM, 2023 WL 2785015, at *9-10 (S.D. Fla. Apr. 5, 2023) (holding that SEC had plausibly alleged that individual had "general awareness" of his participation in an improper activity where he held himself out as the CEO of the company in question and reviewed false press releases before they were issued, ignored signs that a billion-dollar gold transaction was fraudulent where it was memorialized, in part, by a single-page document purporting to transfer title in gold to the company but was replete with errors and did not even contain the agreeing parties' names).

The F&M Defendants acknowledge that recklessness can be found where an aider and abettor should be alerted by "red flags" that signify that the primary violator has violated the

securities laws. *See SEC v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 784-85 (N.D. Ill. 2016). But courts have emphasized that "red flags" must be "suspicious events creating reasons for doubt," and that recklessness will not be found absent such circumstances. *Morris*, 2005 WL 2000665, at *9 (internal quotations omitted). The red flags identified by the SEC highlight the baselessness of its claims against the F&M Defendants.

The SEC attempts to satisfy the second element by noting that: (a) the transactions on which the F&M Defendants had previously represented McKnight had not closed; (b) McKnight had not yet finished paying his bills from past representations by the F&M Defendants; (c) McKnight "suddenly" had money at his disposal; (d) the F&M Defendants were aware that McKnight had been incarcerated for drug charges long before he had a relationship with them; (e) McKnight was not mentioned by name in the wire transfers at issue; (f) the name of an entity sending money into F&M's account and the name of an entity receiving money out of F&M's account "were very similar"; and (g) two of the payments that McKnight instructed the F&M Defendants to make were to an entity called "Boiler Room Holdings" which "Miller conceded was a bad name for an investment company." Compl. ¶ 91.

In some instances, the Report misstates the SEC's allegations. For example, the Report states that one of the "red flags" that should have alerted the F&M Defendants to fraud is the fact that "McKnight, a client with drug-related convictions, had not paid approximately $150,000 in legal bills but suddenly informed Miller that investors would be wiring over $2 million in funds to the firm's escrow account." Report at 9. The SEC does not allege that McKnight "suddenly informed Miller" that investors would be wiring over $2 million into the firm's escrow account. *See* Compl. ¶ 85 ("In late April 2018, McKnight called Miller out of the blue and informed him that investors would be wiring money to the firm's escrow account."). McKnight did not advise

how much investor money would be wired. And even if he had, neither the SEC nor the Report explains how a client with unpaid legal bills having control over outside investor funds (i.e., *not his own* funds that could be used to pay the legal bills) is a "red flag" signifying that that client is engaging in an alleged Ponzi scheme. Instead, the Report creates a fact that imbues the F&M Defendants with greater knowledge than alleged in the Complaint. McKnight never told the F&M Defendants the amount that investors would be wiring to their escrow accounts prior to the wires processing. The wires occurred through multiple smaller transactions over the course of 14 weeks—the total amount was not known until all wires were processed. Without the Report's creation of a fact not alleged in the Complaint, there is no rationale to rely on to reach the Report's holding that the F&M Defendants had a general awareness sufficient to satisfy the requisite legal standard.

Nor does the Report explain why the SEC's legal conclusions about what the (unknown) investors knew and "took comfort in" constitute facts supporting a showing of general awareness. In fact, in many instances, the SEC alleges that the F&M Defendants were affirmatively aware of various things to facilitate McKnight's scheme, including: "Miller and F&M knew investors took comfort in the fact that the law firm was involved in the receipt of their investment funds" (Compl. ¶ 3); "Miller and F&M knowingly imbued McKnight's scheme with an air of legitimacy and gave investors a false sense of security, thereby furthering McKnight's deception" (*Id.*); Miller and F&M "were familiar with McKnight" and knew he had never been involved in a successful transaction, that he owed legal fees, etc. (*Id.* ¶¶ 84, 91). The SEC does not allege a single fact supporting its conclusion that the F&M Defendants "knew investors took comfort in the fact that the law firm was involved in the receipt of their funds"—especially because, as the SEC *also* alleges, the F&M Defendants did not even know the law firm's name was being used in these

transactions, and the F&M Defendants did not "attempt to communicate with" any of the investors involved. *See id.* ¶¶ 86, 87. The SEC's contradictory allegations create a factual impossibility. It cannot be the case that the F&M Defendants knew that they were providing legitimacy to a scheme, or that the F&M Defendants knew what would convince these particular investors to participate in it, given the SEC's contradictory allegations. *Id.* ¶¶ 85, 86.

Similarly, the SEC's allegations that investors allegedly relied on F&M's involvement in the transactions or that the F&M Defendants imbued the transactions with legitimacy are eviscerated by the fact that the 13 Sims investors participated in the HYIP Scheme despite the F&M Defendants not being used in those transactions. The SEC does not allege that the F&M Defendants are implicated in those transactions. The F&M Defendants were unknowingly inserted as an escrow agent into the four agreements with the three HWIT investors they had no knowledge of or with which they did not participate. Compl. ¶ 86.

Further, as discussed in depth in the F&M Defendants' motion to dismiss and reply in support, the other "red flags" alleged are not the types of "obvious indicators of wrongdoing" that courts have found to be sufficient. *See, e.g.*, *Morris*, 2005 WL 2000665, at *9-10 (holding that defendant was not reckless and did not ignore any obvious red flags or suspicious events where the defendant reviewed and signed public filings the SEC alleged were misleading and knowingly failed to disclose a change in accounting practices in the public filings). Both the Report and the SEC fail to explain how a client with a previous—decades old—drug-related conviction puts any reasonable person on notice that that individual is participating in a Ponzi scheme when the individual is in receipt of investor funds for an investment opportunity. The SEC does not explain how it was a "red flag" that the investor funds that the F&M Defendants were told they would be receiving from *the HWIT investors* did *not belong to McKnight*. *See* Report at 10 (noting that the

F&M Defendants encountered "red flags" that included, among others, that "none of the wire confirmations referred to McKnight or otherwise indicated that the funds belonged to him"). This is common sense, not a warning of any kind of wrongdoing.

Likewise, both the Report and the SEC imply that the F&M Defendants facilitated McKnight's scheme by lending legitimacy to the transactions by using the name of a reputable law firm. However, the Report ignores the allegation in the Complaint that the F&M Defendants did not know F&M's name was being used to solicit the HWIT investments. Compl. ¶86. The Report also ignores the SEC's allegation that the very agreements with these investors stated that HWIT would arrange and pay for "surety bonds" to protect the investments. Report at 3; Compl. ¶ 77. While both the SEC and the Report seem to agree that "basic due diligence" would have put the F&M Defendants on notice of McKnight's scheme, and their alleged failure to do so constitutes their "general awareness" of the scheme, neither the Report nor the SEC appear to consider that "obtain[ing] or review[ing] the underlying investment agreements" would only have shown the F&M Defendants that the HWIT investments were protected by surety bonds. Compl. ¶ 87. As stated above the F&M Defendants did conduct due diligence, but it was not effective because of McKnight's lies, which deceived the F&M Defendants. Once again, the SEC hangs its hat on the fact that the F&M Defendants failed to take action, while also acknowledging, as it must, that taking that action would still not have put the F&M Defendants on notice of—or clothed them with "general awareness of"—McKnight's wrongdoing. In short, both the SEC and the Report erroneously conclude that the "red flags" alleged in the Complaint are adequate for pleading aiding and abetting liability—which they are not.

**D.      The Report Erroneously Concludes that the SEC's Allegations Are Sufficient for Showing the "Substantial Assistance" Required for Aiding and Abetting Liability.**

The Report gives little analysis of the "substantial assistance" prong of aiding and abetting liability, and erroneously concludes that the SEC's allegations are sufficient for showing that the F&M Defendants provided the "substantial assistance" required. Simply put, the F&M Defendants—having no knowledge of McKnight's alleged scheme—provided no assistance to McKnight in furthering his scheme.

That is because the F&M Defendants were not conscious that their actions were actually facilitating a scheme. *See, e.g.*, *SEC v. Mudd*, 885 F. Supp. 2d 654, 670-71 (S.D.N.Y. 2012) (a defendant must "consciously assist[ ] the commission of the specific crime in some active way" (internal citations omitted)). Here, the SEC's *only* allegation of "assistance" to McKnight's alleged fraud provided by the F&M Defendants is that they—an attorney and a law firm—followed a firm client's instructions to accept and disburse assets over which the client claimed discretion. Compl. ¶¶ 84–93. As demonstrated above, the SEC admits that the F&M Defendants did not know of McKnight's fraudulent scheme.

Further, the funds from the wire transfers at issue also wound up in F&M's operating account because of the fraudulent conduct perpetrated by HWIT, Promoter A, and McKnight, and the lies McKnight told Miller regarding the funds, not any act attributed to the F&M Defendants. Compl. ¶¶ 34, 41, 77, 85. But the SEC relies on allegations that the F&M Defendants failed to identify and act on purported red flags. *Id*. ¶ 91. The SEC wholly fails to allege that the F&M Defendants participated in McKnight's fraud as "something they wished to bring about" and that they "sought to make it succeed." *SEC v. Stack*, No. 1:21-cv-0051-LY, 2021 WL 4777588, at *7 (W.D. Tex. Oct. 13, 2021) (quoting *SEC v. Apuzzo,* 689 F.3d 204, 212 (2d Cir. 2012)). In fact, the

SEC's Complaint reveals that it was McKnight—and McKnight alone—who lied to the F&M Defendants about his use of their firm account and caused the account to be used as part of his fraud. *See, e.g.*, *id.* ¶¶ 84 ("*McKnight directed* that certain investor deposits into his HYIP Scheme be funneled through . . . Frost & Miller"); 85 ("*McKnight also falsely told Miller* that there was no escrow arrangement affecting the funds."); 89 ("*McKnight . . . provided the coordinates for the F&M operating account.*"); and 92 ("*McKnight made at least four Ponzi payments* using the HWIT Investors' funds deposited into the F&M accounts.") (emphasis added).

The allegations against the F&M Defendants are vastly different than those in which district courts in the Fifth Circuit found the SEC sufficiently alleged "substantial assistance." For example, in *Stack*, the defendant was the CEO, president, treasurer, secretary, and director of a shell corporation that raised money from investors by knowingly making and circulating materially false and misleading statements about the corporation. *Stack*, 2021 WL 4777588, at *1-2 (W.D. Tex. Oct. 13, 2021). The court found that the defendant had provided "substantial assistance" in furtherance of the primary perpetrator's securities violations because the defendant opened bank accounts where investors would send their money, reviewed and approved false and misleading documents, made materially false and misleading statements in communications to investors, and served as the signatory on bank accounts that wired funds to the primary perpetrator. *Id.* at *8.

Similarly, in *SEC v. Felton*, the SEC alleged that the defendant helped his employer to artificially inflate its revenues for one quarter by more than $3.3 million. No. 3:20-cv-0822-G, 2021 WL 2376722, at *1 (N.D. Tex. June 10, 2021). The defendant, who was the Senior Vice President of Supply Chain at the company, helped others to facilitate the revenue inflation by affirmatively marking orders as complete in the company's internal records when he knew that the orders would not be complete until the following quarter, by directing a third-party warehouse to

relocate unshipped orders to incorrectly calculate the company's inventory, and by generally concealing the fact that the orders were not, in fact, complete. *Id.* at *10; *see also, e.g.*, *SEC v. Montgomery*, No. SA-20-CA-598-FB, 2021 WL 210749, at *4-5 (W.D. Tex. Jan. 20, 2021) (holding that defendant provided substantial assistance by making material misrepresentations and omissions to investors in a fraudulent oil and gas scheme during phone calls and lease tours to potential investors, as well as by creating deceptive promotional videos); *SEC v. Jackson*, 908 F. Supp. 2d 834, 863-64 (S.D. Tex. 2012) (finding that the defendant provided "substantial assistance" to furthering securities violation by repeatedly approving fees to customers despite knowing that they were associated with false paperwork and ensuring that the customs agent was paid his fee to ensure that bribes reached foreign officials).

The allegations against the F&M Defendants are also vastly different from those in which the SEC has successfully stated aiding and abetting claims against attorneys. *See, e.g.*, *SEC v. Carrillo Huettel LLP*, No. 13 Civ. 1735 (GBD), 2017 WL 213067 (holding that law firm's motion to dismiss aiding and abetting claim was appropriately denied where the lawyer and law firm drafted documents *knowing* that they contained false or misleading statements to further a scheme to falsely inflate the price of shares); *SEC v. Milan Grp. Inc.*, 962 F. Supp. 2d 182, 196-202 (D.D.C. 2013) (vacated in part on other grounds) (holding that, at minimum, the SEC had established aiding and abetting liability against the principal of a law firm where she *actively assisted* a fraudster in soliciting investors by misrepresenting her relationship with the fraudster to lend credibility to his investment scheme, signed "client representation" letters with those sending money to the firm's account and allowed a portion of the funds to be sent back to her).

Again, the Report's creation of a critical fact that is not alleged in the Complaint undercuts its holding. The Report states: "McKnight . . . suddenly informed Miller that investors would be

wiring over $2 million in funds to the firm's escrow account[.]" Report at 9. But, McKnight never said *investors were* wiring *$2 million*. And, the Complaint does not allege that the F&M Defendants were told that investors were wiring $2 million *before* the wires came in. Instead, the wires occurred through multiple transactions over the course of 14 weeks. The Report alleges that Miller did not conduct due diligence, however the Complaint admits Miller attempted to conduct due diligence but was lied to by McKnight. Compl. ¶ 85. Therefore, the Report creates an alleged "red flag" and relies on that created fact to find "substantial assistance." With or without the Report's creation of facts, the Report's holding is incongruous with prior case law because no similar cases have found "substantial assistance" under such facts.

In short, the SEC does not, and cannot, come close to satisfying this element and its claims against the F&M Defendants. By disregarding the case law analyzing "red flag" aiding and abetting cases, omitting key facts, and adopting the SEC's contradictory, conclusory, and speculative allegations, the Report erroneously concludes the SEC's Complaint plausibly alleges that the F&M Defendants provided "substantial assistance" in support of McKnight's scheme. Therefore, the Complaint, as it relates to the F&M Defendants, must be dismissed as a matter of law.

## IV.    CONCLUSION AND REQUEST FOR ARGUMENT

Based on the foregoing, Defendants Frost & Miller, LLP and Kenneth Miller respectfully request that the Court reject the Report and Recommendation in its entirety, grant their motion to dismiss the Complaint with prejudice, and grant any further and additional relief the Court deems to be proper and just. The F&M Defendants also respectfully request oral argument on their Objections to the Report and Recommendation.

Respectfully submitted,

Dated: October 31, 2023

*/s/ Jeff Ansley*

Jeffrey J. Ansley
State Bar No. 00790235
jansley@vedderprice.com
Samuel M. Deau
State Bar No. 24135506
sdeau@vedderprice.com
Katie A. Lee (*pro hac vice* forthcoming)
Illinois Bar No. 6337232
klee@vedderprice.com

**VEDDER PRICE P.C.**
300 Crescent Court, Suite 400
Dallas, Texas 75201
469.895.4890

**ATTORNEYS FOR DEFENDANTS
FROST & MILLER, LLP AND
KENNETH MILLER**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically to all counsel of record on the 31st day of October, 2023 *via* the Court's CM/ECF system.

*/s/ Jeff Ansley*

Jeffrey J. Ansley